# SCHUYLER et al. v. SOUTHERN PACIFIC COMPANY.

No. 2034.    Decided August 28, 1909.    On Rehearing June 2, 1910 (109 Pac. 458).

1. APPEAL AND ERROR—TIME FOR TAKING APPEAL—COMPUTATION. Though the verdict was rendered more than six months before the perfection of an appeal, the appeal will not be dismissed on the ground that it was not taken in time, where it sufficiently appears from the record that it was taken within the statutory period from the date of the order overruling a motion for a new trial.    (Page 585.)

2. REMOVAL OF CAUSES—GROUNDS FOR REMOVAL—CASES ARISING UNDER CONSTITUTION AND LAW OF UNITED STATES—ALLEGATIONS OF PLEADINGS. In an action against a carrier for the death of an assistant chief mail clerk, the complaint alleged that deceased, while not on duty, was riding on defendant's train, under an engagement between defendant and the United States government to transport the mail, together with the mail clerks and employees in the railway mail service, and that it was necessary for deceased in the discharge of his duties to ride in the mail cars, and that while he was "necessarily in a certain mail car" operated by defendant, and while he was being so transported by defendant "for a consideration" and under arrangements between defendant and the "government of the United States," the train was derailed, and deceased was killed. *Held*, that the complaint did not present a case of a civil nature at law, arising under the Constitution and laws of the United States within the meaning of the removal act, in that it involved the question as to whether under Const. U. S. art. 1, sec. 8, declaring that Congress shall have power to establish post offices and post roads, Act Cong. March 3, 1897, c. 385, 29 Stat. 644, pertaining to the messenger service in connection with railroads, Act Cong. Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), and acts amendatory thereof, including Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1909, p. 1149), Act Cong. June 13, 1898, c. 446, 30 Stat. 440, and Act Cong. June 9, 1896, c. 386, 29 Stat. 313 (U. S. Comp. St. 1901, p. 2724), and acts amendatory thereof and supplemental thereto, relating to the transportation of railway mail clerks, and the Hepburn Act (Act June 29, 1906, c. 3591, sec. 1, par. 4, 34 Stat. 584 [U. S. Comp. St. Supp. 1909, p. 1151]), prohibiting common carriers engaged in interstate commerce from issuing or giving free interstate transportation for passengers, a mail clerk in the railway mail service of the United States when not engaged in the discharge of his duties as a mail clerk, and when traveling for his own convenience and purpose, can lawfully be given free interstate transportation, since

the complaint did not show on its face that deceased's right to transportation was derived from the federal statutes, or that his. cause of action was based on such statutes. (Page 587.)

3. REMOVAL OF CAUSES—GROUNDS—CASES ARISING UNDER CONSTITUTION AND LAWS OF THE UNITED STATES. A case cannot be removed simply because in the progress of the litigation it may be necessary to give a construction to the Constitution or laws of the United States. (Page 588.)

4. INFANTS—ACTIONS BY—APPOINTMENT OF GUARDIAN AD LITEM. Comp. Laws 1907, sec. 2907, 2908, providing that, when an infant is a party, he must appear either by his general guardian or by a guardian *ad litem* appointed by the court in which the action is pending, and that a guardian *ad litem* may be appointed in any case when it is deemed by the court in which the action is prosecuted expedient to represent the infant, though he may have a general guardian and may have appeared by him, authorizes the appointment of a guardian *ad litem* for resident and nonresident minor plaintiffs as well as resident and nonresident minor defendants. (Page 588.)

5. TRIAL—INSTRUCTIONS—DUTY OF JURY TO OBEY. The jury is bound to follow instructions of the court, whether such instructions are right or wrong. (Page 593.)

6. CARRIERS—WHO ARE PASSENGERS—BURDEN OF PROOF. In an action for the death of a railway mail clerk, the burden of proving that deceased was in the discharge of his official duties at the time of the accident in which he was killed is on plaintiff. (Page 593.)

7. TRIAL—INSTRUCTIONS—WEIGHT OF EVIDENCE. In an action against a carrier for the death of a railway mail clerk, an instruction that it is to presumed that deceased was in the railway car lawfully and rightly in the discharge of his official duties as such mail clerk, and the burden is on defendant to overcome that presumption by affirmative proof and by a preponderance of evidence, but that presumption would be overcome if it was shown by affirmative proof and by preponderance of the evidence that he was not in the discharge of his official duties, was erroneous, as invading the province of the jury on the weight to be given a mere inference of fact. (Page 593.)

8. EVIDENCE—BURDEN OF PROOF. An evidentiary showing, however strong, made by a party having the affirmative of an issue, whether by direct evidence of the witnesses or indirect evidence of inferences and presumptions, does not cast the burden on the other party to prove the negative, but the burden of proof in either case remains throughout with him who has the affirmative. (Page 594.)

ON REHEARING.

9. CARRIERS—WHO ARE PASSENGERS—EVIDENCE. In an action against a carrier to recover for the death of a railway mail clerk, evidence *held* insufficient to support a finding that at the time of the accident in which decedent was killed decedent was on defendant's train in the discharge of duties pertaining to the railway mail service.    (Page 595.)

10. CARRIERS—INJURIES TO PASSENGERS—PLEADING—VARIANCE. In an action against a carrier to recover for the death of one alleged to have been a passenger, there can be no recovery on the ground of ordinary negligence of defendant in injuring a person not a passenger.    (Page 597.)

11. CARRIERS—INJURIES TO PASSENGERS—PLEADING AND PROOF—"MATERIAL VARIANCE." Where a complaint alleged that plaintiff's decedent at the time of his negligent killing by defendant carrier was in the discharge of his duties as a railway mail clerk, a recovery may be had, though the evidence establishes that decedent at the time of the fatal accident was not in the discharge of his duties as a mail clerk, but was a gratuitous passenger, as a carrier owes the same degree of care in the transportation of a gratuitous passenger as in the case of a passenger for hire; and hence the variance was not material within the meaning of Comp. Laws 1907, secs. 3001-3003, providing that no variance between the allegations and the proof is to be deemed material unless it has actually misled the adverse party to his prejudice.    (Page 597.)

12. CARRIERS—INJURIES TO PASSENGERS—QUESTION FOR JURY. In an action against a carrier to recover for the death of railway mail clerk, evidence *held* to conclusively show that decedent at the time of his death was rightfully on defendant's train so as to warrant the direction of a verdict in favor of plaintiff on the issue as to whether or not he was a trespasser on the train.    (Page 600.)

13. STATUTES—CONSTRUCTION—EXECUTIVE CONSTRUCTION. While the rulings of the Interstate Commerce Commission as to the construction to be given to federal statutes relating to interstate commerce will be given great weight by the courts in determining the meaning of such statutes, such weight is not to be accorded to such rulings where they are given in a non-official character and in response to private inquiry.    (Page 604.)

14. CARRIERS—REGULATION—FREE TRANSPORTATION. Congress may in prohibiting interstate carriers from issuing free transportation except such persons from the operation of the general prohibition as it may see fit.    (Page 604.)

15. STATUTES—CONSTRUCTION—EXCEPTIONS. An exception of a particular thing from the operation of the general words of a statute tends to show that it was the opinion of the lawmakers that

the thing excepted would have been within the general words had not the exception been made. (Page 604.)

16. CARRIERS—WHO ARE PASSENGERS—FREE TRANSPORTATION—"PASSENGERS FOR HIRE." Employees of the railway mail service, traveling in the postal or mail cars in charge of the mails under a contract between the government and the carrier for the carriage of mail and the mail clerks, are "passengers for hire" to whom the carrier owes the same duty that it owes to the passengers riding upon the train in so far as its liability for personal injuries arising from its negligence is concerned. (Page 604.)

17. STATUTES—CONSTRUCTION—EXCEPTIONS IN PENAL STATUTES. Exceptions in penal statutes ought to be liberally construed in favor of him who is charged with a violation of the statute. (Page 606.)

18. CARRIERS—INTERSTATE TRANSPORTATION—PASSES. The Hepburn act (Act June 29, 1906, c. 3591, sec. 1, par. 4, 34 Stat. 584 [U. S. Comp. St. Supp. 1909, p. 1151]), providing that no carrier subject to the provisions of the act shall issue in interstate commerce free transportation, except to railway mail service employees, cannot be construed to prohibit the issuance of a free pass to an employee of the railway mail service for transportation of such employee while not in the actual discharge of his official duties. (Page 606.)

19. CARRIERS—INJURIES TO PASSENGER—FREE TRANSPORTATION—VIOLATION OF STATUTE. Where an interstate carrier issued free transportation to an employee of the railway mail service for use by such employee while not on duty, it could not avoid liability to the personal representatives of such employee for its negligence in causing his death by alleging that such transportation was issued in violation of the Hepburn act (Act June 29, 1906, c. 3591, sec. 1, par. 4, 34 Stat. 584 [U. S. Comp. St. Supp. 1909, p. 1151]). (Page 606,)

20. CARRIERS—WHO ARE PASSENGERS—CONTRACT OF TRANSPORTATION. The relation of carrier and passenger may exist independent of any contract between the parties for transportation. (Page 607.)

21. CARRIERS—WHO ARE "PASSENGERS." The test in determining who are passengers is whether the person desiring passage in good faith offered himself for the purpose of being carried as a passenger, and that he was as such accepted and received by the carrier, who undertook to transport him. (Page 611.)

Appeal from District Court, Second District; *Hon. J. A. Howell,* Judge.

Action by Mary R. Schuyler and others against the Southern Pacific Company.

From a judgment for plaintiffs and an order overruling a motion for a new trial, defendant appeals.

AFFIRMED.

*P. L. Williams, George H. Smith* and *John G. Willis* for appellant.

*Agee & McCracken* for respondents.

STRAUP, C. J.

This is an action brought by the plaintiffs and respondents to recover damages for the death of Charles A. Schuyler, alleged to have been caused by the defendant's negligence while a passenger on one of defendant's trains. A verdict was rendered for the plaintiffs on the 20th day of August, 1908. It is not made to appear when the judgment was entered. It is shown that the judgment was recorded on the 17th day of December, 1908. A notice of appeal was served and filed the 1st day of April, 1909. The statute provides that an appeal may be taken within six months from the entry of the judgment. While no motion is made to dismiss the appeal, it nevertheless is urged that we are without jurisdiction to entertain the appeal because it was not taken in time. It is assumed by the respondents that the judgment was entered on the day the verdict was rendered, and it is claimed by them that it is not shown by the bill of exceptions that a motion for a new trial was made, or, if made, when it was overruled, and therefore it is not affiratively made to appear that the appeal was taken within six months from the entry of the judgment, or the overruling of the motion for a new trial. Though the judgment was entered on the day the verdict was rendered, yet we think the appeal was in time, for it is sufficiently disclosed by the bill of exceptions that a motion for a new trial was made within time, and that it was overruled on the 4th day of January, 1909, at which time the judgment became final. The appeal was taken within six months from that time.

It is alleged in the complaint that the defendant is a common carrier of passengers for hire and owned and operated a railroad from Ogden, Utah, to San Francisco, Cal.; that, in connection with the business of carrying passengers for hire, the defendant had entered into engagements with the government of the United States to transport and carry between the points named United States mail, mail clerks, and employees employed in the railway mail service, including the deceased, for which the defendant received compensation from the government of the United States; that it was necessary for the deceased, who was an assistant chief mail clerk, in the discharge of his duties, to be in and ride on the mail cars operated by the defendant in carrying mails, and while he was "necessarily in a certain mail car" operated by the defendant in one of its trains from Oakland to Ogden, and while he was being so transported by the defendant "for a consideration and under arrangements between it and the government of the United States," the train between Gartney and Lucin stations, in Utah, was derailed through the defendant's negligence, and the deceased killed. A petition was filed by the defendant to remove the case to the Circuit Court of the United States in and for the District of Utah on the ground "that the suit herein is of a civil nature at law, arising under the Constitution and laws of the United States (Section 8 of Article 1), declaring that Congress shall have power to 'establish postoffices and post roads,' also 'to regulate commerce with foreign nations and among the several states.' Also under the act of Congress of the United States approved June 13, 1898, and June 9, 1896, and acts amendatory thereof and supplemental thereto, relating to the transportation of railway mail clerks, and other officers of the postoffice department of the government of the United States; also the act of March 3, 1897, pertaining to messenger service in connection with railroads, etc.; also act of Congress of the United States, approved February 4, 1887, and acts amendatory thereof, including the act approved June 29, 1906." The court denied the motion to remove. Complaint is made of this ruling. It is especially urged

by the appellant that plaintiffs' case necessarily involves a construction of section 1, par. 4, of the Hepburn act (Act June 29, 1906, c. 3591, 34 Stat. 584; Fed. Stat. Ann. Supp. 1907, p. 169 [U. S. Comp. St. Supp. 1909, p. 1151]), which prohibits common carriers engaged in interstate commerce from issuing or giving free interstate transportation for passengers, except the persons and classes therein specified. It is contended that the case involves the question as to whether under the statute a clerk in the railway mail service of the United States, when not engaged in the discharge of his duties as a mail clerk, and when traveling for his own convenience and purpose wholly unconnected with any official duty, can lawfully be given free interstate transportation as in the act provided for the free transportation of railway mail clerks. The appellant claims that the statute forbids free interstate transportation for mail clerks in such case, and that the deceased on his trip from San Francisco to Ogden, when the derailment occurred, was so traveling for his own convenience wholly unconnected with any official duty, and that he was therefore not a passenger, but a trespasser. It, however, is averred in the complaint that the deceased was transported by the defendant under arrangements between it and the government of the United States by which the defendant engaged for a consideration and upon compensation received by it from the government of the United States to safely transport the deceased between the points named, and that the defendant, under such arrangement, had undertaken to so carry and transport the deceased. On the face of the complaint, it is not made to appear that the deceased's right to transportation was acquired by virtue of the federal law referred to, nor that the construction of a federal law is involved, nor that plaintiffs' case is dependent upon a federal law. Nor is it alleged in the complaint that the deceased was not in the discharge of his public duties, nor that he was traveling for his own convenience. The allegations of the complaint show rather the contrary. To make a suit arise under a law of the United States, the plaintiff must claim some legal right under such

law to sustain his cause of action, which legal right is controverted by the defendant; and to make a case removable from the state court to the Circuit Court of the United States, under the present general statute, on the ground that it arises under a law of the United States, it must appear from the plaintiff's statement of his cause of action in the initial pleading that it does so arise. (Moon on Removal of Causes, sections 101, 104.)   A case cannot be removed simply because in the progress of the litigation it may be necessary to give a construction to the Constitution or laws of the United States. It not being made to appear by the plaintiffs' complaint that a federal law is involved, the court did not err in denying the motion for removal.

The suit was brought by Mary R. Schuyler, the deceased's widow, and his minor children by a guardian *ad litem*. The appointment of the guardian was alleged in the complaint. When the plaintiffs offered in evidence the order of the appointment, the defendant objected on the grounds that the statute only provides for the appointment of a guardian *ad litem* in a pending action, and then only for non-resident minor defendants; that the minor plaintiffs were non-residents, and that no action was pending when the order appointing the guardian was made.

We think the statute (Sections 2907-8, Comp. Laws 1907) contemplates and provides for the appointment of a guardian *ad litem* for resident and non-resident minor plaintiffs as well as resident and non-resident minor defendants.

In the defendant's answer, it was admitted that the deceased was in the employ of the government of the United States as a railway mail clerk, and that the defendant was a common carrier for the transportation of property and passengers for hire, as averred in the complaint, and "that contractual relations existed between the defendant and the government of the United States with respect to the carrying of certain United States mail and certain employees of said government to whom was intrusted the supervision and care

of such mails as were by defendant transported under the agreement aforesaid, and that the defendant received compensation therefor." It denied the alleged negligence, and pleaded that the deceased was only entitled to be upon the mail cars when he was in the discharge of his duties as a mail clerk, and that he, without the consent and knowledge of the government of the United States or the defendant, and in violation of the agreement existing between the defendant and the government, and with the intent, and for the purpose of deceiving the government and the defendant and avoiding the payment of fare, entered the mail car, and wrongfully, fraudulently, and in violation of law, and without the consent and knowledge of the defendant, remained in the car, and attempted to secure transportation therein, and, while he was so wrongfully and fraudulently upon the car, he received the injuries which resulted in his death. Upon these issues, the court instructed the jury that if they found from the evidence that the deceased was traveling on the defendant's train, and was not performing duties relating to the mail service, but was traveling "simply for his own purpose unconnected with any official duties," he was not a passenger for hire, but a trespasser to whom the defendant would not be liable for the alleged negligence and resulting injury. The appellant contends that the evidence without dispute shows that the deceased was traveling on the defendant's train "simply for his own purpose unconnected with official duties," and that the verdict which was rendered by the jury was therefore contrary to the evidence and against the charge.

The evidence without dispute shows the following facts: In November, 1906, the deceased, who then lived at Oakland, Cal., and who was in the employ of the United States mail service at San Francisco, was appointed an assistant chief clerk of the railway mail service with headquarters at Ogden, Utah. The Postmaster General issued to him the following commission: "Post-Office Department, Washington, D. C. To Whom Concerned: The bearer hereof, Charles Albert Schuyler, has been appointed an assistant chief clerk, railway

mail service, with headquaters Ogden, Utah, and will be
obeyed and respected accordingly. Railroad companies are
requested to extend to the holder of this commission the facil-
ities of free transportation on the lines named on opposite
page. If fare is charged receipt should be given. Valid only
when issued through the office of the Second Assistant Post-
master General and countersigned by James E. White."
This was signed by G. B. Cortelyou, the Postmaster General,
and countersigned by James E. White, general superintend-
ent. On the opposite page were the words: "Good between
all stations Utah, Idaho, Nevada, California, Montana and
Colorado." The position to which the deceased was appoint-
ed embraced the territory of Utah, a portion of Montana and
Idaho, and a small portion of Nevada and Colorado. It
did not include any portion of California. The chief clerk
at Ogden, the assistant chief clerk, and all mail clerks run-
ning between San Francisco and Ogden, were under the
supervision of the general superintendent at San Francisco.
The superintendent testified that the deceased was required
to perform "all of the duties assigned to him (by the chief
clerk at Ogden), office duties assigned to him by the chief
clerk, in addition to that, took the place of the chief clerk
in the chief clerk's absence, and became the acting chief
clerk, with all of the powers of chief clerk; performed all
the duties of the chief clerk, had the general duties assigned
him of overseeing the service. . . . "The chief clerk, or
assistant chief clerk" was required to "pay particular atten-
tion to the service, if he is properly performing his duties,
whenever he is around a mail car, whenever he is at a trans-
fer station or comes in contact with railway postal clerks,
in other words, anything that pertains to the transportation
of mail is under his care, and carried with it the responsi-
bility to all officials of the service. . . . All officials of
the service are expected and are instructed to pay particular
attention to the service, whether or not it comes within his
particular scope. . . . We have general unwritten laws
or regulations requiring every official of the service to be on
watch regarding the service. . . . The chief clerk at

Ogden had jurisdiction only over the helpers running west on the line on which the accident happened. . . . All postal clerks work directly under the chief clerk of the local district. The chief clerk is reuired to report at the end of the probationary term of the clerk, as to his fitness for permanent employment. On that report I base by recommendation to the department at Washington, and the report of the chief clerk determines, in a large measure, whether or not the clerk shall be retained. The duty of the assistant chief clerk, if he comes in contact with the postal clerks, whether or not he finds an irregularity, is to make a report to his chief clerk immediately upon his return. Blank forms are furnished to all offices for such purposes." The chief clerk at Ogden testified: "The duties of an assistant chief clerk were an assistant to the chief clerk in the performance of the duties and attending to any matters that might be assigned to him by the chief clerk. At any time he would be on the road he would be expected to ride in the mail car and take notice of anything that would be for the improvement or betterment of the service, either in the plan of work pursued by the clerks or the distribution." The deceased, at Ogden, received a telegram from Oakland announcing the death of his child. With the permission of the chief clerk at Ogden, he took the first fast mail train for California. The chief clerk furnished him a portable cot, blankets, and bedding to occupy quarters in a mail car. When he left Ogden for Oakland there was no official business requiring him to make such a trip. No instructions were given him in respect of any business or duties pertaining to the service. The chief clerk at Ogden in supervising the business of his territory was required, from time to time, to go on the road on official business. But he had always performed such duties himself. The performance thereof had at no time been required of the deceased. When the deceased arrived at San Francisco, he there called on the general superintendent, and informed him of the death of the deceased's child. No 'matters were discussed, and no transactions were had relating to the mail service. Nothing was talked about between them except the deceased's misfortune and bereavement. The superintendent inquired

of him when he intended to return to Ogden. He answered the following day. They discussed the train which he would take and the time he would reach Ogden. On the 12th day of January, 1907, the deceased, on his return trip, at Oakland, in the presence of the train agent and the conductor in charge of the train about to leave for Ogden, entered a mail car with his grips. The evidence of his right to transportation on the defendant's train was the commission issued by the Postmaster General. There were some mail clerks in the car. He, however, had no supervision or direction over them. While it is made to appear that in going from Ogden to Oakland and in returning from Oakland to the place of the derailment the deceased traveled in a mail car, yet it is not made to appear what, if anything, he did in the mail car, or that he rendered any service, or performed any duties pertaining to the railway mail service. We think the only conclusion authorized from the evidence is that he was traveling in the mail car on account of matters personal to himself and wholly unconnected with his service to the government. We do not say that the commission issued to the deceased, if recognized and accepted by the defendant, did not entitle him in such case to the transportation in question, or if the commission was recognized and accepted by the defendant, and by virtue of it the defendant assumed and undertook to carry and transport the deceased, and he in good faith believed the commission entitled him to the transportation, that the deceased was a trespasser on the defendant's train, or that it was not liable to the plaintiffs for the consequences of its alleged negligence, though under the Hepburn act the defendant could not lawfully give him free transportation, except when he was on duty. But in the complaint it is in effect alleged that the defendant had agreed and received compensation to carry the deceased when he was in the discharge of duties as clerk of the railway mail service, and that the deceased was in the mail car in the discharge of such duties. The defendant admitted that it had entered into arrangements with the United States government to carry the deceased in such case, but alleged that he was not

in the discharge of duties, and had not entered the car for any such purpose, but, on the contrary, had entered the car, and knowingly and fraudulently and without the knowledge or consent of the defendant attempted to ride therein in violation of the defendant's agreement with the government to carry mail clerks. The court gave the jury binding instructions to render a verdict for the defendant if they found that the deceased was traveling in the mail car, and was "not performing any of his duties as such assistant chief clerk on said train," but was traveling "simply for his own purposes unconnected with any official duties." The court conditioned the right of recovery upon the performance of such duties on the train by the deceased, regardless of all other questions. It was the duty of the court to instruct the jury in matters of law; and the jury, as matter of duty, were bound to follow the instructions. Right or wrong, they were the law of the case for the jury to obey and follow. This they did not do. We find no evidence to warrant a finding of the condition upon which the court instructed the jury the plaintiffs could recover.

In this connection, the court also charged the jury that it was undisputed that the deceased was an employee of the railway mail service, and that at the time of the injury he was in a mail car "on the defendant's line of road, and I charge you the presumption is that he was there lawfully and rightfully in the discharge of his official duties as such employee, and the burden is upon the defendant to overcome that presumption by affirmative proof and by a preponderance of all the evidence;" but that the presumption would be overcome if it was shown by affirmative proof and by a preponderance of the evidence that he was not in the discharge of his official duties. The relation of carrier and passenger for hire between the defendant and deceased was in effect alleged by the plaintiffs, or such a relation as gave the deceased rights of a passenger, and imposed upon the defendant corresponding duties and obligations of a carrier of passengers. Such a relation was denied by the defendant. The

burden was upon the plaintiffs, not the defendant, to establish it. That burden did not shift, but rested upon the plaintiffs througout the case. And, if upon all the evidence it was not established by a fair preponderance, the plaintiffs, and not the defendant, must fail. The charge of the court is not only in conflict with these well-recognized principles, but also invaded the province of the jury on the weight to be given a mere inference of fact. It in effect told the jury that a certain presumption of law arose; that is, that a definite probative weight in law attached by reason of certain undisputed facts, and that the burden was cast on the defendant to overcome it by affirmative proof and by a preponderance of the evidence. What the court thus incorrectly characterized a presumption of law by instructing the jury to give it a definite probative effect was, at most, a mere inference of fact, and a fact, too, which, under the charge of the court and the law of the case as given the jury, was essential to plaintiffs' right of recovery. That is to say, the court, in other portions of the charge bound the jury to find that the deceased was in the discharge of his duties as a mail clerk before they could properly render a verdict for the plaintiffs, and here told them that such fact was established as matter of law by the undisputed proof of certain other facts, and then cast the burden on the defendant to overcome such presumption by affirmative proof, and by a preponderance of the evidence that the deceased was not in the discharge of his duties. An evidentiary showing, however strong, made by a party having the affirmative of an issue, whether by direct evidence of the testimony of witnesses or indirect evidence of inferences and presumptions, does not cast the burden on the other party to prove the negative, but the *onus probandi* in either case remains throughout with him who has the affirmative. The court, therefore, in directing the jury to give a definite probative effect to the admitted facts, and in casting on the defendant the burden of proving the negative to overcome such effect, committed error.

It is not necessary to express an opinion on the question presented as to whether the Hepburn act permits an interstate carrier to give free intrestate transportation to railway mail clerks when not on duty, for the reason that it is alleged in the complaint and admitted in the answer that the arrangement existing between the defendant and the government of the United States for the transportation of the deceased was for hire and when he was in the discharge of duties in the railway mail service. It was alleged in the complaint, and denied in the answer, that he was in the discharge of such duties. With respect to the relation between the defendant and the deceased that was the only issue submitted to the jury. And, as already held by us, we do not find sufficient evidence to support the verdict which was rendered thereon.

For the reasons given, the judgment is therefore reversed, and the case remanded for a new trial, costs to appellant.

FRICK and McCARTY, JJ., concur.

## ON REHEARING ON RESPONDENTS' APPLICATION.

STRAUP, C. J.

A petition for rehearing was filed on behalf of respondents. They urged that we had overlooked evidence tending to show that the deceased was traveling in the mail car in the discharge of duties. They further urged that, though he was not in the discharge of duties, nevertheless, upon the undisputed evidence showing that the appellant received him as a passenger and as such undertook to carry and convey him and that his death was caused by its negligence, the respondents were entitled to recover as matter of law. A rehearing was granted, and the case reargued and resubmitted.

We have reread the record, and again reached the conclusion that there is no evidence to support a finding that the deceased was traveling on appellant's train in the discharge or in pursuance, of duties pertaining to the railway mail service. Upon the evidence adduced the only permissible inference is that he left Ogden and went

to Oakland solely on account of the death of his child, and that he was on the return journey of such a mission when the train was derailed. Whatever presumption might be indulged under other circumstances that he was in the discharge of railway mail duties from the facts that he was a railway mail clerk and was in a mail car is entirely overcome by the affirmative and direct showing that there was no business or engagement relating to his service which occasioned or required the trip to be made by him; that no directions, instructions, or requests were given to or made of him in respect thereof; that duties on the road had theretofore always been performed by his chief and not by the deceased; and that the trip was occasioned solely on account of the death of his child.

The other proposition is more difficult. The claims made by the respondents in that regard are: (1) That under the Hepburn act the appellant could lawfully give, and the deceased receive, free transportation, it being conceded that he was a railway mail service employee, though he was not on duty and was traveling on account of mere personal matters; and (2) though the act did not permit the giving of free transportation in such case, and though the appellant could not lawfully permit the deceased to be carried on its train by virtue of the commission which was issued to him unless he was on duty, nevertheless the appellant, having received the deceased upon its train and permitted him to ride in the mail car, and by virtue of the commission undertook to transport him as a passenger regardless of the question whether he was or was not on duty, must be held responsible for the breach of duty so assumed and undertaken by it, to the same extent that it is liable to passengers for hire. On the other hand, it is asserted by the appellant that the respondents, having alleged in the complaint that the deceased was in effect a passenger for hire arising out of particular alleged facts—a contract between the government and the appellant to carry mails and mail clerks, including the deceased, for which appellant received and was paid compensation, and that under such arrangement, and for

such consideration, the appellant had undertaken to carry the deceased from Oakland to Ogden, that the deceased in the discharge of duties as a railway mail clerk was required to be in the mail cars operated by the appellant, and "was in said car with the knowledge and consent of the said defendant, its agents and servants, as such clerk, and in the discharge of duties as such" at the time of the derailment— must recover, if at all, upon proof of the particular relation of passenger and carrier as alleged, and that they cannot be permitted to recover on the theory that the deceased was a gratuitous or other passenger; that under the Hepburn act neither the appellant nor its agents in charge of its train could lawfully permit the deceased to ride on his commission when he was not on duty, nor could it or its agents otherwise lawfully permit him to ride gratuitously, and, since the deceased was riding on appellant's train by virtue of his commission when not on duty, he was engaged in the commission of an act in violation of law, and was hence a trespasser to whom appellant owed no duty except to refrain from willfully injuring him.

It undoubtedly is true that a plaintiff may not declare on one theory and recover on the proof of another. He may not for instance declare on one or several alleged acts of negligence, and recover on the proof of another or others. So, in a complaint, a plaintiff seeking to recover from a carrier for the negligent killing of a passenger, no recovery can be had unless the relation of carrier and passenger is shown, although the facts are such as to warrant a recovery in the absence of such relation for ordinary negligence in injuring a person not a passenger. The duty owing, the measure of liability, and the degree of care required are different. (*Chicago & E. I. R. Co. v. Jennings,* 190 Ill. 478, 60 N. E. 818, 54 L. R. A. 827.) If therefore, in the complaint a particular kind of passenger is alleged, may recovery be had on the proof of a different kind? That is, if in the complaint it is alleged that the passenger was one for hire, may recovery be had if the proof shows that he was a gratuitous passenger? The rule

at common law obtained, and, as stated in 1 Chitty on Pleadings, p. 392, that "if the plaintiff, though needlessly, describe a tort and the means adopted in effecting it with minuteness and particularlty, and the proof substantially vary from the statement, there will be at fatal variance which will occasion a nonsuit." But by sections 3001, 3002, 3003, Comp. Laws 1907, it is by our Code provided:

"No variance between the allegations in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits. Whenever it appears that a party has been so misled, the court may order the pleading to be amended, upon such terms as may be just.

"Where the variance is not material, as provided in the next preceding section, the court may direct the fact to be found according to the evidence, or may order an immediate amendment, without costs.

"Where, however, the allegation of the claim or defense to which the proof is directed is unproved, not in some particular or particulars only, but in its general scope and meaning, it is not to be deemed a case of variance within the last two sections but a failure of proof."

In speaking of such codes, Mr. Bates, in his work on Pleading and Practice (volume 1, p. 512), says:

"Under the Code no variance is material unless it has actually misled the adverse party to his prejudice on the merits, and no allegation is material unless essential to the claim or defense. The evident object of the Code is to vest in the court a discretion, where it can be done without surprise or injury, to try the case on the evidence outside of the pleadings, and if objection be made to allow the pleadings to be conformed to the evidence at once and without terms, and where there is no objection to refuse to reverse on account of the variance."

Had respondents merely averred that the appellant was a common carrier of passengers, that the deceased was a passenger on one of its trains, and that it had assumed and undertaken to transport him as such, such allegations would have been sufficient to show the relation of passenger and carrier and the duties of a carrier owing by it to him, and any evidence would have been permissible thereunder which tended to show the relation of carrier and passenger, whether for hire or that of a gratuitous passenger. (*Birmingham Ry. Lt. & P. Co. v. Adams,* 146 Ala. 267, 40 South. 385,

119 Am. St. Rep. 27; *Lemon v. Chanslor,* 68 Mo. 340, 30 Am. Rep. 799; *Ohio & M. R. Co. v. Craucher,* 132 Ind. 275, 31 N. E. 941; *Gulf, Colo. & S. Fe. R. Co. v. Wilson,* 79 Tex. 371, 15 S. W. 280, 11 L. R. A. 486, 23 Am. St. Rep. 345; 2 Bates, Pl. & Pr. p. 1174.)   In the case of *Gulf, Colo, & S. Fe R. Co. v. Wilson, supra,* it was held that proof that plaintiff was a United States mail agent on defendant's car in charge of mail under an allegation that he was a passenger does not constitute a variance.   Nor are such general averments of the relation of carrier and passenger, as stated, open to the objection that they are statements of mere conclusions.   (*Ohio & M. R. Co. v. Craucher, supra.*)   If the duties imposed by law for the carriage of a passenger for hire were other than or different from those imposed for the carriage of a gratuitous passenger, or if a different or higher degree of care was required in the one than in the other, it can readily be seen that no recovery could be had under an averment that the injured person was a passenger for hire on proof that he was a mere gratuitous passenger. But it is now well settled that there is no difference in the degree of care required of carriers, nor in the measure of liability, in the transportation of passengers for hire and gratuitous passengers.   It was wholly unnecessary for respondents to aver with minuteness the particular facts as was done, upon or out of which the relation of carrier and passenger was based or grew.   There must, of course, be sufficient averments and evidence to support a finding of the relation of carrier and passenger, else no recovery can be had. The essential in its general scope and meaning is the averment and proof of that relation.   It undoubtedly was sufficiently averred in the complaint, and, though the evidence does not support the averment that the deceased was on the defendant's train in the discharge of duties pertaining to the railway mail service, and hence does not show that he was a passenger for hire, as was in effect averred, nevertheless it does suppport a finding of the relation of carrier and passenger; that is, the evidence does support a finding that the appellant received and accepted the deceased for the pur-

pose of being conveyed in the mail car from Ogden to Oakland and from Oakland to Ogden, and that it undertook to so transport him in virtue or by reason of the commission held by him.

The further question to be determined is whether such relation and appellant's undertaking to transport the deceased, and its alleged breach of duty resulting in his death, are so conclusively made to appear as to entitle the respondents to a directed verdict on such issues. If they were entitled to such a direction, then the errors committed by the trial court, and referred to in our opinion on the former hearing, are harmless. That the car was derailed through the negligence of appellant as alleged in the complaint, and that the deceased was killed by reason of such derailment, is, upon the record, not open to controversy. No substantial conflict is presented by the evidence on that subject. The serious question is: Does the evidence conclusively show the relation of carrier and passenger? On such question we think the following facts are conclusively made to appear: The deceased, who was a railway mail clerk in the service of the government of the United States, left Ogden and went to Oakland solely on account of the death of his child. He remained at Oakland a few days. When there, he went on board appellant's train on his return trip. When he left Ogden, he entered a mail car in appellant's train. The evidence of his right to enter the mail car and be carried by appellant was the commission issued to him, which, on its face, entitled him to transportation between all stations in Utah, Nevada, and California. The commission on its face granted "the facilities of free transportation on the lines named," regardless of the question whether he was or was not in the discharge of public duties. It was issued to him before the Hepburn act took effect. The derailment and the deceased's death occurred fourteen days after the act took effect. It was admitted by the parties on the trial that the deceased used the commission on the trip "as the evidence of his right to ride—the evidence of his right of transportation"—and that no question would

be raised with respect to the exhibition of the commission to the conductor in charge of the train. The deceased at Oakland, in the presence of the conductor and train agent, and with their knowledge, entered a mail car in a train about to leave for Ogden, and impliedly with their consent, at least without their objection. In view of the stipulation, and upon the whole record, we think the only permissible inferences are that the deceased, both in going to and in returning from Oakland, rode in the mail car with the knowledge and consent of appellant's conductors in charge of the train; that the appellant, its conductors and agents in charge of the train, and the deceased, in good faith, assumed and believed that the commission entitled him to so ride and to be transported in the mail car regardless of the fact whether he was or was not on duty, and that the commission was so treated and so recognized by them, and as "the evidence of his right of transportation." There is nothing in the record to support the allegations in the answer that the deceased entered the mail car without appellant's knowledge or consent, or against its will, or with the intent, or for the purpose, of deceiving or defrauding the appellant or the government, or that he otherwise entered the car clandestinely or fraudulently, or in bad faith, or with any wrongful design or purpose. The evidence, quite conclusively, shows the contrary. The deceased was therefore not a trespasser. To be a trespasser, it was essential that his presence on appellant's train was without its knowledge or consent, or was gained or obtained through fraud or deceit.

Now, what legal liability attaches for an injury inflicted upon one through the carrier's negligence in being transported under such circumstances? The appellant asserts not any, for the Hepburn act forbids such a transportation when the deceased was not on duty. Section 1, par. 4, of the act (34 Stat. 584; Fed. Stat. Ann. Supp. 1907, p. 169), is as follows: "No common carrier subject to the provisions of this act, shall, after January 1, 1907, directly or indirectly, issue or give any interstate free ticket, free pass, or free transportation for passengers, except to its employees and

their families, its officers, agents, surgeons, physicians, attorneys at law; to minister of religion, traveling secretaries of railroad Young Men's Christian Associations, inmates of hospitals, and charitable and eleemosynary institutions, and persons exclusively engaged in charitable and eleemosynary work; to indigent, destitute, and homeless persons and to such persons when transported by charitable societies or hospitals, and the necessary agents employed in such transportation; to inmates of the national homes or state homes for disabled volunteer soldiers, and of soldiers' and sailors' homes, including those about to enter and those returning home after discharge, and boards of managers of such homes; to necessary caretakers of live stock, poultry, and fruit; to employees on sleeping cars, express cars, and to linemen of telegraph and telephone companies; to railway mail service employees, postoffice inspectors, customs inspectors, and immigration inspectors; to newsboys on trains, baggage agents, witnesses attending any legal investigation in which the common carrier is interested, persons injured in wrecks, and physicians and nurses attending such persons: Provided, that this provision shall not be construed to prohibit the interchange of passes for the officers, agents, and employees of common carriers, and their families; nor to prohibit any common carrier from carrying passengers free with the object of providing relief in cases of general epidemic, pestilence, or other calamitous visitation. Any common carrier violating this provision shall be deemed guilty of a misdemeanor, and for such offense, on conviction, shall pay to the United States a penalty of not less than one hundred dollars nor more than two thousand dollars, and any person, other than the persons excepted in this provision, who uses any such interstate free ticket, free pass or free transportation shall be subject to a like penalty." Before the passage of this act, it, of course, was lawful for a carrier to give free interstate transportation for passengers; and, while there is no direct evidence of it in the case, we think from what was made to appear in argument we may assume that, before this act took effect, commissions to railway mail service employees were

honored by carriers on the lines designated thereon, and such employees given the facilities of free transportation, whether on duty or not. And upon the record we think we are justified in assuming that after the act took effect, and at the time of the transportation in question, the appellant and the deceased in good faith believed that the provisions of the Hepburn act did not forbid a carrier from transporting a railway mail service employee, on his commision issued to him, and over the lines designated thereon, though he was not on duty. This assumption, of course, is wholly immaterial to the construction of the act, but it is important as bearing on the question whether the deceased was riding on the mail car with appellant's consent or against its will. In June, 1907, about five months after the derailment, in response to an inquiry made of them, the members of the Interstate Commerce Commission expressed their views that under the Hepburn act a carrier who knowingly permitted railway mail service employees to use, and that such employees who accepted, free transportation when not in the discharge of their public duties, and when traveling unofficially, and for their personal benefit or pleasure, would subject themselves to the penalties of that act. This conclusion was reached upon a classification of the persons enumerated in the exceptions of the act, and who might receive free transportation, into three groups: (1) The "persons actively connected with the operation of railroads or with the administration in various capacities of their affairs;" (2) the "persons who are either engaged in administering charities or are the object of charitable aid;" and (3) persons "who have to do with the affairs of persons, firms, or corporations, engaged in business along the line of railroads . . . and not in the employ of the railway companies." To those classified in the first and second groups, it is held by them, free interstate transportation may be given without offending the provisions of the act, though the transportation is wholly for their personal pleasure and benefit; but to those classified in the third group, free interstate transportation cannot lawfully be given to or received by them "except in connection

with the actual performance of duties, or on the return journey." Had this ruling been made as the result of some hearing or proceeding before the commission involving the question, we might be inclined, though not required, to accept such a construction, even though it was not in accord with our own views. However, since it was a mere response in reply to a letter seeking the views of the members of the commission, apparently not upon an actual but a moot case, the ruling ought not be given the weight that otherwise should be given it had it been made under other circumstances. Notwithstanding the high regard entertained by us for the judgment of the members of the commission, we nevertheless are of the opinion that the construction placed by them on the Hepburn act in this regard is not the correct one. Congress, of course, could expect any persons it desired from the operation of the general provisions of the act forbidding the giving of free interstate transportation for passengers. It made such exceptions. It is generally recognized that an exception of a particular thing from the operation of the general words of a statute shows that in the opinion of the lawmaker the thing excepted would be within the general words had not the exception been made. Tested by this principle, had the exception in respect of railway mail service employees not been made, would the carriage of such employees on mail cars in the discharge of duties pertaining to the railway mail service be in violation of the general provisions of the act? We think not. It is generally held by the courts that "a mail agent or postal clerk employed and engaged in the service of the government and traveling in the postal or mail car, in charge of the mails, under a contract between the government and the carrier for the carriage of mail and the mail clerks having lawful custody thereof, is a passenger for hire to whom the carrier owes the same duty that it does to passengers riding upon the train, in so far as its liability for personal injuries arising from its negligence is concerned. The compensation for the carriage of such agents or clerks must be regarded as included in that

paid by the government for the carriage of mails." (Moore on Carriers, p. 577.) Such carriage, under such circumstances, in no sense would be free transportation, but transportation for hire, paid for by the government. We cannot believe it was thought by Congress that, if the exception relating to railway mail service employees was not made, the carriage of such persons in charge of the mails in mail cars or engaged in duties pertaining to the railway mail service under a contract between the government and the carrier for the carriage of mails and mail clerks would, in any sense, be free transportation within the general words, and in violation of the general provision, of the act forbidding free interstate transportation. We think it manifest that something more and other than that was intended by such exception.

In the act is contained a number of exceptions. Some are without limitation or restriction; others are limited and restricted. Thus, "necessary caretakers of live stock," etc., "employees on sleeping cars," "newsboys on trains," and other exceptions specified in the act, having in themselves restrictive or qualifying terms. But in the exception "its (the carrier's) employees and their families, its officers, agents," etc., "ministers of religion," indigent persons, inmates of national or state homes, etc., are without terms of restriction or limitation. So is the exception as to "railway mail service employees, postoffice inspectors, custom inspectors, and immigration inspectors." We see no more license to read into this exception words of restriction or limitation than into the first, second, third, or fourth exceptions specified in the act. Because such words are more easily read into this exception than into the second, third, or fourth is no reason why they should be read into it. They can as readily be read into the first as into this exception. That is, the words "when on duty" can as readily be read into the exception pertaining to the carrier's employees as in the exception pertaining to railway mail service employees. The fact that the exception pertaining to "the employees on sleeping cars, express cars," is restricted and limited, and that the exception to "railway mail service employees" is not

restricted or limited, is, we think, significant, as bearing upon the intention that the former was intended to be restricted, and the latter not. If Congress intended the limitation or restriction to apply to both, such an intention could very easily have been expressed. We can see good reason why it was desired to restrict the one and not the other. We need not, however, speculate on that, for the intention to restrict the one and not the other is, we think, made manifest by the language employed. Furthermore, exceptions in penal statutes ought to be liberally construed in favor of him who is charged with the violation of the provisions of the statute. We are therefore of the opinion that the Hepburn act does not forbid a carrier from giving railway mail service employees free interstate transportation when not on duty and when traveling for their own benefit or pleasure.

Though the construction which we have given the Hepburn act should not be correct, and though it was unlawful for the appellant to give, and the deceased to receive, free transportation on his commission, when he was not on duty, yet we are also of the opinion that under all the circumstances of the case the appellant, having undertaken and assumed to carry and transport the deceased as a passenger by reason of the commission, cannot escape liability for the consequences of its negligence on that ground. Moore, in his work on Carriers (page 570), says: "A person who travels upon a pass unlawfully issued to him in violation of a law prohibiting the issuing of free passes is not a trespasser, but is entitled to the rights of a passenger." The same principle is stated in 5 A. and E. Ency. Law (2d Ed.), p. 508. And to that effect are the following cases: *Bradburn v. Whatcom Co. Ry. & L. Co.*, 45 Wash. 583, 88 Pac. 1020, 14 L. R. A. [N. S.] 526; *Buffalo, etc., R. Co. v. O'Hara*, 3 Penny [Pa.] 190; *McNeill v. Durham & C. R. Co.*, 135 N. C. 682, 47 S. E. 765, 67 L. R. A. 227. In the last-named case numerous cases bearing on the subject are cited and reviewed. These cases proceed upon the theory, and, as stated by the court in the case of *Delaware, Lacka-*

*wanna & Western R. Co. v. Trautwein,* 52 N. J. Law, 169, 19 Atl. 178, 7 L. R. A. 435, 19 Am. St. Rep. 442, "that a railroad company having accepted a passenger is under an obligation to take due and reasonable care for his safety, and that that obligation arises by implication of law, independent of contract. To give the plaintiff a standing in court to sue for the injury, she has no need of the aid of a contract which was illegal," and that the act of traveling on a pass forbidden by law is not the contributing cause of the injury. The principle involved is analogous to that applied where, by the weight of authority, it has been held that a carrier, having accepted one as a passenger violating a statute prohibiting travel on Sunday, owes to him "the same duty as if he were lawfully traveling, and is responsible for a failure to perform it, the same in the one case as in the other," and that "the gravamen of the action is the breach of the duty imposed by law upon the carrier of passengers to carry safely, so far as human skill and foresight can go, the persons it undertakes to carry. This duty exists independently of contract, and although there is no contract in a legal sense between the parties. Whether there is a contract to carry, or the service undertaken is gratuitous, an action on the case lies against the carrier for a negligent injury to a passenger. The law raises the duty out of regard for human life, and for the purpose of securing the utmost vigilance by carriers, in protecting those who have committed themselves to their hands." (*Carroll v. Staten Island R. Co.,* 58 N. Y. 126, 17 Am. Rep. 221.)

We are aware some courts have held that "the relation between carrier and passenger is contractual and is created only by contract, express or implied" (*Farley v. Cincinnatti H. & D. Co.,* 108 Fed. 14, 47 C. C. A. 156), upon which the conclusion may be based that if there is no valid contract of carriage, either express or implied, no relation of carrier and passenger is shown; and since the tort cannot be made to appear without proof of the illegal contract or transaction, on principle of public policy, a plaintiff who requires aid from an illegal transaction or contract to establish his de-

mand must fail. Ordinarily the relation of carrier and passenger is created by contract, either express or implied. But the relation may exist independent of any contract between the parties themselves. We think this is clearly shown by Mr. Justice Douglas in the case of *McNeill v. Durham & C. R. Co., supra.* We think his conclusion is supported by the weight of authority that "the law imposes upon a common carrier certain duties and liabilities which adhere to the nature of his calling. We prefer to adopt the more direct expression, and say that those duties and liabilities are imposed by law upon common carriers upon consideration of public policy independent of contract, and arise from the nature of their public employment." The same principle is stated by the Maryland court in *State, to Use of Abell, v. Western Maryland R. Co.,* 63 Md. 433, that "the duty of the carrier to convey safely does not result from the consideration paid, but is imposed by law," and that "a common carrier who accepts a party to be carried owes to that party a duty to be careful, irrespective of contract." Moore, in his work on Carriers (page 568), says: "Although it was for a long time urged on behalf of the carrier that it was liable only on its contract, and consequently that the law imposed no duty upon it in the case of a gratuitous undertaking to carry a passenger, there being no consideration, and therefore no legal contract, express or implied, the courts finally held otherwise, and it is now well settled that the carrier owes a duty to all upon its vehicle, independent of contract, even when the service is gratuitous, and that the breach of this duty is negligence, for which it is liable to the same extent that it is liable to passengers who pay fare. The confidence induced by undertaking any service for another is a sufficient legal consideration to create a duty in the performance of it." In Fetter on Carriers of Passengers, sec. 220, it is said: "It is now well settled that a carrier by its acceptance of a passenger as a passenger comes under an obligation to take due and reasonable care for his safety, which obligation arises by implication of law, and independent of contract, so that it may exist though the contract of

carriage is illegal, or though there is no express contract of carriage." In Wharton's Law of Negligence, secs. 354, 355, it is said: "But there is now an almost uniform acquiescence in the true view that a person who undertakes to do a service for another is liable to such other person for want of due care and attention—the *diligentia* of the bonus *et diligens paterfamilias*—in the performance of the service, even though there is no consideration for such undertaking. . . . The carrier is bound from the time he assents thus to carry such person to exercise towards him the diligence, prudence, and skill of a good carrier in that particular kind of transport." The rule is stated by the English court in *Austin v. Great Western R. Co.,* L. R. 2 Q. B. 442, that "the right which a passenger by railway has to be carried safely does not depend on his having made a contract, but that the fact of his being a passenger casts a duty on the company to carry him safely."

It is unnecesary to further refer to the authorities or cases. We are of the opinion that, when a common carrier accepts a person as a passenger, he is not permitted to deny that he owes to him the duty of diligence, prudence, and skill, which as carrying on a public employment he owes to all his passengers, and that he cannot escape liability for a negligent performance of that duty resulting in injury by urging that the pass or commission was issued, or the gratuitous carriage permitted by him in violation of law. Though the gratuitous carriage of the deceased by the appellant should under all the circumstances be held to have been in violation of the Hepburn act, in the commission of which both the deceased and the appellant were in *pari delicto,* and alike subject to the penalties of that act, yet that wrong in no sense influenced, nor was it a contributing cause of the wrong or negligence of appellant resulting from its breach of duty imposed upon it by law and arising from the facts of its acceptance of the deceased as a passenger and its undertaking to carry him as such. Such duties were not dependent upon the particular kind of contract of carriage existing between

itself and the deceased, but upon the facts that it had accepted him as a passenger, and as such undertook to convey him. And we say here, as was said in the case of *Carroll v. Staten Island R. Co., supra,* "this case, therefore, is not within the principle of many of the cases cited, which forbid recovery upon a contract made in respect to a matter prohibited by law, or for a cause of action which requires the proof of an illegal contract to support it." Mr. Justice Dixon, in the case of *Sutton v. Town of Wauwatosa,* 29 Wis. 21, 9 Am. Rep. 534, stated the proposition well when he said that "one party to the action, when called upon to answer for the consequences of his own wrongful act done to the other, cannot allege or reply the separate or distinct wrongful act of the other, done not to himself nor to his injury, and not necessarily connected with, or leading to, or causing or producing the wrongful act complained of," and that "himself guilty of a wrong, not dependent on nor caused by that charged against the plaintiff, but arising from his own voluntary act or his neglect, the defendant cannot assume the championship of public rights nor to prosecute the plaintiff as an offender against the laws of the state and thus to impose upon him a penalty many times greater than what those laws prescribe. Neither justice nor sound morals require this and it seems contrary to the dictates of both that such a defense should be allowed to prevail." For much stronger reasons should such principles be applied, when, as here, the defendant itself participated in the wrong charged against the deceased, the gratuitous carriage in violation of law. To permit the defense in such case is to allow the appellant to excuse itself or claim immunity from the consequences of its own tortious acts, negligently done to the deceased, on the ground that it and the deceased had been guilty of some other independent wrong, or violation of law, which in no sense influenced nor caused the tortious act of the appellant, and was not a contributing cause thereof, or of the injury, and bore no relation to either the cause or effect produced by it. We do not mean to say, and do not hold, that if it were only lawful for the deceased to have traveled on his

commision when he was in the discharge of his public duties, and unlawful for him to do so when he was not on duty, and if he, without the knowledge or consent of appellant or its agents in charge of the train, had made an unauthorized use of the commission by traveling thereon when he was not on duty, that the relation of carrier and passenger would have been created rendering the appellant liable as in the case of a breach of duty in negligently transporting a passenger. A mere intruder or trespasser, of course, cannot create the relation of carrier and passenger by his own act. Nor can one create such relation by fraudulently or deceitfully making an unauthorized use of a commission, pass, ticket, or the like, nor by otherwise gaining his presence on the train by fraud or deceit, or through collusion or connivance with mere train crews. The test is: Did the person desiring passage in good faith offer himself for the purpose of being carried as a passenger, and was he as such accepted and received by the carrier and undertaken to be transported by it? If so, then the relation of carrier and pasenger arises, and the law casts the duty on the carrier to convey him safely, and to exercise toward him "the diligence, prudence, and skill of a good carrier in that particular kind of transport," regardless or independent of any contract existing between them. Now, while it was alleged in the answer that the deceased wrongfully and fraudulently, and with the intent, and for the purpose, of deceiving the appellant, and without its knowledge or consent, and against its will, entered and remained in the mail car, there is no evidence justifying a finding of any such facts. Upon the record the case is reduced to the simple facts where the deceased, with the full knowledge and consent of the appellant, was permitted to travel in the mail car on the commission issued to and held by him. The commission was "the evidence of his right of transportation." Upon that the deceased offered himself to be carried, and upon that the appellant accepted and received him, and undertook to transport him. There are, therefore, no facts nor inferences to support the averments contained in the an-

swer, or to justify the submission of the case to the jury on such issues or theory. Upon the whole record, we are persuaded that on the question of appellant's liability the respondents were entitled to recover as a matter of law, and hence the errors referred to on the former hearing were nonprejudicial to the appellant. (*Madsen v. Utah Light & Ry. Co.*, 36 Utah, 528, 105 Pac. 709.)

Our former ruling reversing the judgment of the court below, and remanding the case for a new trial, is therefore set aside, and the judgment of the court below is now affirmed, with costs to respondents. It is so ordered.

FRICK and McCARTY, JJ., concur.