## NOBLE v. BESSEMER STEAMSHIP CO.

1. MASTER AND SERVANT — NEGLIGENT INJURIES — CONTRIBUTORY NEGLIGENCE OF FELLOW-SERVANT.

The right of a servant to recover against his master for negligent injuries is not defeated by the contributory negligence of a fellow-servant. So *held* where two employés jointly used an appliance which one of them knew to be defective.

2 SAME—DEFECTIVE APPLIANCES—LIABILITY OF MASTER.

Where the tools to be used by a servant in the prosecution of a given work are not left to his own selection, but he is provided with a specific appliance (*e. g.*, a "soft-head," for use in riveting metal plates), the master is bound to see that the appliance so furnished is in the first instance reasonably safe and fit for the purpose for which it is intended.

3. TRIAL—INSTRUCTIONS—REQUESTS TO CHARGE.

   Where the court, before reading certain requests to charge, said, "Counsel have handed me some requests, as stating propositions of law by which you should be guided in determining your verdict," an objection that he did not say that the requests were given, or were correct propositions of law, is without force.

4. SAME—FAILURE TO PRODUCE WITNESS.

   In an action for negligent injuries, it appeared that G., a former employé of defendant, who had personal knowledge of matters testified to by plaintiff, was absent from the State; and defendant orally requested the court to charge that defendant's failure to procure G.'s attendance as a witness should not be considered by the jury. In response the court instructed the jury that G. might have been called by either party; that, "unless you find as a fact in this case that defendant had some reason for not procuring G. as a witness, and, even if they had, that plaintiff had just as much right to call him as the defense, and you shall not infer anything against the defense in this case by reason of their omission to call him as a witness. He is not a party to the case, and plaintiff had the same right to call him as defendant." *Held*, not objectionable as authorizing the jury to find that defendant had some reason for not procuring G.'s attendance, and, if it had, to consider its failure to produce him.

Error to Bay; Sharpe, J., presiding. Submitted February 1, 1901. Decided June 17, 1901.

Case by William B. Noble against the Bessemer Steamship Company for personal injuries. From a judgment for plaintiff, defendant brings error. Affirmed.

*T. A. E. & J. C. Weadock*, for appellant.

*Pierce & Kinnane*, for appellee.

MOORE, J. This is an action on the case for the recovery of damages on account of the loss of an eye. From a judgment of $4,000 obtained by plaintiff, defendant has brought the case here by writ of error.

Plaintiff was employed as a calker upon a vessel being constructed at F. W. Wheeler & Co.'s yard in West Bay

City by defendant.   Wheeler & Co. had commenced the
work, but, failing in the performance of its contract, the
defendant took the yard and crew, and proceeded to finish
it.   Plaintiff commenced working for Wheeler & Co., and
continued when defendant took over the operation of the
yard.   Plaintiff and his witnesses testified that on July
26, 1898, plaintiff was engaged in striking with a riveting
hammer a soft-head held against a rivet then being put in
on the bulkhead bar of a vessel by one John Lepan.   A
piece of steel flew from the soft-head, and struck him in
the eye, putting it out.   The soft-head in question was
made from a riveting hammer, and it is claimed that the
head which was to be struck with the riveting hammer
was not properly tempered.   Plaintiff had been a riveter
for four years and upwards, and claims he knew nothing
about the condition the soft-head in question was in.   The
defendant furnished the tools used by its employés.   There
were between 50 and 60 riveting gangs then at work for
defendant in the yard, each gang consisting of four men,
—a head riveter, an assistant riveter, a heater, and a holder-
on.   John Lepan was head riveter of the gang in which
plaintiff was working.   A tool storeroom was maintained
by the defendant, in charge of a keeper named Gereoux,
whose duty was to give out and furnish tools to the work-
men. It is the claim of the plaintiff that Lepan went to
the storeroom for a soft-head, and Gereoux gave out one
to him, but, before using it at all, Lepan returned it to
Gereoux, and complained of its defective condition.   Lepan
testified as follows:

" I did not pick out the tool myself.   Gereoux gave it to
me.   He was the man in charge of the storeroom where
the employés were accustomed to go for tools to do their
work.   The soft-head which he gave me was made from
a broken riveting hammer, the hammer end being cut off.
It was too hard, because it had been tempered as a rivet-
ing hammer, and the temper had not been taken out so as
to make it a soft-head.   I took it back to the storeroom
the same day I received it, and wanted to get another one.
Mr. Gereoux told me, if I could find a better one, to take

it; but he said that was the best one he had in the store-room. I looked over the rest of the soft-heads in the store-room, and they were all worn out, and not fit for use. He had them thrown in one pile of cull tools. I told Mr. Gereoux that I did not want to use the tool. He said, 'I will give you an order to go to the blacksmith and get it fixed.' He gave me an order to go to the blacksmith, and the blacksmith told me he could not fix any more tools unless I would get an order from Mr. Gilkey, who was foreman of all the riveters on all the boats. The blacksmith referred to was the man employed by the company to repair tools for the machine shop and the riveters. That was his business. I then went to Mr. Gilkey for an order, and told him what was the matter with the tool. He said: 'John, I cannot give you an order. I have got to finish those boats with the tools we have got. I was told by the company not to make any more expense on these boats; they would have to be done with the tools we had; to do the best we could.' I then went right down, and went to work. That was the day before Noble started to work with me. After Noble came, we used the soft-head on three rivets. We hadn't finished the third one, just two and a half. We were finishing the third one, when this piece broke, and Noble was injured. We had not used it before he was injured, and the soft-head had remained without use from the time I took it to the shop until the time Noble was hurt. It was kept in a keg, with other tools, except when we had to shift from one boat to another. I did not tell Noble that I did not think it was a safe tool to work with, because, if I told him, he would have quit, the same as the other one quit before, and I would be out of work."

Plaintiff also claimed that, at the time of the injury, he was striking the soft-head as riveters usually do, and Lepan was holding it against the rivet in the usual way, and that he did not know the dangerous condition of the soft-head. The defendant denied that the tool was not reasonably safe for use, and also denied Lepan's version of his obtaining the tool.

In his charge to the jury, after stating the claims of the parties, the trial judge said:

"The claim of the plaintiff—and I say to you the only ground in this case on which the plaintiff can recover—is

the claim that the soft-head which he struck with that hammer was not a safe tool, was not reasonably safe to be used by men engaged in riveting as these men were at that time.   Now, a hammer or soft-head might be safe when given out to workmen, and it might become unsafe by reason of its use by them; but I say to you as a matter of law in this case, and I wish you to distinctly remember that part of it, that the defendant in this case is not liable in case you find that the defect in this soft-head, if you find it was defective, was caused by the use that it had had.   The plaintiff claims that at the time Lepan got it from the storehouse, or at the time he first commenced to use it, he discovered that it was not a safe tool to use; and if you find that to be the fact,—if you find that, at the time Lepan got this soft-head from the storehouse, it was not then a reasonably safe tool with which to do the class of work which it was expected by the defendant Lepan and those associated with him would do,—then the company is negligent.   The law imposes the duty upon those who employ laborers, and who furnish them with tools to use, to see to it that those tools are reasonably safe and fit for the use for which they are intended; and when Lepan went to the storehouse, if he was given this tool by the person whose duty it was to keep those tools and deliver them out to the men, that was a representation by the defendant itself that that tool was reasonably safe and fit for use.

"Now, it appears from the testimony that Lepan, before he used it, discovered that it was not so, as he claims. That would not be any defense to this defendant in this case unless you find that it became so from use.   If this tool was reasonably safe and fit for use at the time Lepan got it, then the company has done all that their duty called upon them to do; but when Lepan took it back, and asked for another, the company, while they should have given him another, or should have put this in proper order, as a matter of mere right, were not under any legal obligation to do it.   He knew that the tool was unsafe, and it was his option either to work with it or to quit.   If he continued to work with it after he knew it was unsafe, he was guilty of just as much negligence as the company was, and you haven't any right to award a verdict against the defendant in this case by reason of the fact that they refused to repair this tool for Lepan.   That is not in the case at all, as far as your consideration of it is concerned.

"The first question for you to determine, and the im-

portant question, is, What was the condition of this soft-head at the time it was furnished to Lepan to work with? It seems that he was the boss or the head of the gang of riveters. He had charge of that particular gang, and this soft-head was furnished to him for the use of that gang. Now, the question is, What was the condition of it at that time? The plaintiff claims it was unsafe to use; that it was a broken riveting hammer; and that the temper had not been abstracted from the head of it that had been broken. Now, from the testimony of the witnesses in this case you must determine what you believe the fact to be. If you find that the hammer at that time was in a reasonably safe and fit condition for use, then the plaintiff in this case cannot recover, no matter what you may find the other facts to be. On the other hand, if you find that that hammer at that time was not a reasonably safe tool with which to perform the work that the company designed for it, then the next question for you to determine is, Had the plaintiff, Noble, himself knowledge of the fact that it was unsafe? If he had, and he continued to use it after he had that knowledge, then he cannot recover in this case. After a man discovers that a tool is unsafe, if he continues to use it under the circumstances detailed by the witnesses in this case, without protest to his employer, —and he did not protest,—and I might add, further, without a promise to fix it up, and ask him to use it a little while, until they could get a chance to fix it,—those are the only circumstances under which he would be relieved of the knowledge that he had, if you find he did have it, that the tool was unsafe. As bearing upon that question whether or not Noble had knowledge that his tool was unsafe, if you find it was unsafe, you have a right to consider the manner in which the work was being carried on. You have a right to consider the fact as to whether it required a careful examination of the tool itself to determine its condition, or whether one could tell by a casual glance at it. You have heard the testimony of the witnesses. And, even though you may find that Noble's attention was not particularly called to the defect in this tool by Lepan, if you find as a fact from the evidence, exercising your common sense as applied to the fact, that Noble did know as to what the condition of this soft-head was at the time it was used that day, and that he knew it was unsafe, then I say to you, as a matter of law, that he cannot recover in this suit.

"I think I have already said to you that if this soft-

head was in a reasonably safe condition for use at the time Lepan got it, and if during the time that he was using it, by use or otherwise, it became in a defective condition, and unsafe and unfit for use, that the plaintiff could not recover in this case.   In that case the negligence of his fellow-servant, Lepan, in working with the tool, would be counted as the negligence of the plaintiff, and it would prevent his recovery.   To make that plain to you, perhaps I should say further, if two men are working together for a common employer, at the same class of work, and one is injured through the negligence of the other, of course the employer himself is not responsible to the one who is injured.   He does not guarantee to a man, when he sets him to work, that all the other workmen with whom he is engaged will exercise care and caution. A man, when he goes to work among a number of others, must in law be held to realize that he accepts all the dangers which are naturally incident to the business; and, if the injury in this case was caused by the negligence of his fellow-servant, Lepan, then he cannot recover.   I desire to make that particularly clear to you, and I say to you again, if you find that this soft-head was in proper condition, and fit for use, at the time Lepan got it, then the company had done their full duty to Lepan and the plaintiff.   They had furnished him a reasonably safe tool for use, and, if Lepan afterwards discovered that by use it became unfit for use, and continued to use it, he could not recover had he been injured; and, if he could not recover, the plaintiff could not recover, because his injury is caused by the negligence of Lepan in using this tool.   If, however, it was not reasonably safe and fit for use at the time Lepan got it from the shop, then I say to you, as a matter of law, that, no matter if Lepan did use it after he knew it was unfit for use, the company were negligent themselves in failing to provide their workmen with an article or tool that was reasonably safe and fit for use, and the plaintiff can recover.

"You have a right, in determining these questions, to consider the nature of the tool.   It is not an intricate piece of machinery.   It has been exhibited before you, and your common sense may be applied to the question as to whether or not men who had had experience such as the plaintiff claims he had in the use of such tools would, by ordinary observation, have been able to determine whether this tool was safe or not.   If you find that he knew it was not safe, and still continued to use it, he cannot recover in this case.

" Counsel have handed me some requests, as stating propositions of law by which you should be guided in determining your verdict:

" 'It is the duty of the plaintiff to satisfy you by a preponderance of evidence that all the material allegations of the plaintiff are true, and, unless he has done so, you must find a verdict for the defendant.'

" 'The defendant is not an insurer of his employés against accidents, and the fact that plaintiff has lost an eye by an accident, in and of itself, does not entitle the plaintiff to a verdict.'

" 'Before you can find a verdict for the plaintiff, you must be satisfied that the defendant failed to supply the plaintiff with a reasonably fit safe tool with which to work, and that the plaintiff, on account of such failure, and wholly without negligence on his part, was injured.'

" 'If you find that the tool in question was a reasonably safe one, and that the accident was such a one as might happen by the ordinary use of tools reasonably safe, then it was a risk of the employment, which the plaintiff assumes, and he cannot recover.'

"Defendant's counsel has also suggested that I should say something to you in the way of instruction relative to their omission to produce Gereoux, the man who kept the shop, as a witness. That omission upon their part has been strongly commented upon by the attorney for the plaintiff, and it is not perhaps out of place that I should say something to you about it. Mr. Gereoux might, of course, have been called by either party. The plaintiff would have a right to call him, or the defendant would have that right. It appears by the statement of counsel that he is outside of the jurisdiction of this court,—that he is in New York State, where he could not be reached by a subpœna of the court; and I say to you that, unless you find as a fact in this case that the defendant had some reason for not procuring Gereoux as a witness, and, even if they had, that the plaintiff had just as much right to call him as the defense, and you shall not infer anything against the defense in this case by reason of their omission to call him as a witness. He is not a party to the case, and the plaintiff had the same right to call him as the defendant."

Upon the trial the judge was requested to direct a verdict in favor of defendant. It is insisted that, as Lepan knew the hammer was a defective one, it was negligence

for him to use it; that he was a fellow-servant of plaintiff; and that one of the ordinary risks incident to the employment of the plaintiff was the negligence of his fellow-servants, and for that reason the plaintiff cannot recover,— citing *Hefferen* v. *Railroad Co.*, 45 Minn. 471 (48 N. W. 1); *Rawley* v. *Colliau*, 90 Mich. 31 (51 N. W. 350); *Wachsmuth* v. *Electric Crane Co.*, 118 Mich. 275 (76 N. W. 497). We do not think those authorities are conclusive of this case. In the *Hefferen Case* the court said that the condition of the tool was the ordinary result of use;

"And if a workman should of his own choice, and unnecessarily, use a tool thus plainly defective, when others were provided for his use, he is not absolved from the consequences of his own choice. * * * The servant may, in general, assume, without particular inspection, that the instruments which he is thus required to use are reasonably safe; but when, from use, they have become obviously defective and unfit, and the master has provided others, so that the servant knows that he is not required to use the former, the reason of the law holding the master to responsibility is inapplicable. * * * According to the evidence, it must be taken as a fact that the servants used this particular tool because they did not choose to get another."

In *Rawley* v. *Colliau* it was said:

"The hammer which caused the injury had been in use for a long time, and its condition had been brought about by such use. * * * We cannot assume as a matter of law that the defendants were negligent because this sledgehammer was lying about the shop with its face cracked or battered, when there were others that were sound, and in fit and safe condition for use, and when neither the plaintiff nor any of his fellow-employés were obliged or directed by defendants to use this particular hammer in their work, and when they could have used a hammer not defective."

The court further say:

"If this hammer had been the only one in the shop, or the only one that could be used, or defendants had directed it to be used, knowing its condition, another case would be presented."

In *Wachsmuth* v. *Electric Crane Co.* the court said:

"The record shows defendant furnished an excellent quality of steel from which to make the tool. It was made by a competent blacksmith. There is no claim that when made it was not a proper tool with which to do the work required. * * * The men were not required or expected to use a tool after it became unsafe because of use or from any other cause. They were at liberty to take a defective tool at once to the blacksmith, and have it repaired, or get a new one in its place. * * * The only testimony to the contrary is given by the plaintiff, who never saw the tool, but was of the opinion, judging from the appearance of the small piece of steel taken from his eye, the tool was not a proper one to use."

In none of these case was it shown that the master, the *alter ego*, knew the tool was defective, and, after such knowledge, directed its continued use, the injured person not knowing of the defect. In the *Hefferen Case* it was also said:

"The responsibility of the master for injuries resulting from unsafe instruments or machinery may be said to rest upon the ground that these are the means by which the servant is expected and required to do his work. The master furnishes them for that purpose, and expects and intends that the servant shall use them. The servant knows that this is expected of him. He may, therefore, in general, assume, without particular inspection, that the instruments which he is thus required to use are reasonably safe. But when, from use, they have become obviously defective and unfit, and the master has provided others, so that the servant knows that he is not required to use the former, the reason of the law holding the master to responsibility is inapplicable. If the master provides the proper tools for the use of his servants, responsibility for neglect to remove from the premises such as have become obviously unfit for use, if such responsibility exists, must rest, not on the ground that it is the duty of the master to furnish reasonably safe means for the prosecution of the work which his servants are required to do, but upon the ground that he is chargeable with negligence in suffering dangerous things to be where his servants may be injured by them. This principle is applicable under many circumstances,—as in respect to

concealed dangers, like a pitfall. It cannot be applied under the circumstances here stated without ignoring the duty of the servant to exercise ordinary care in respect to matters concerning which he has no right to assume that there is no danger. If he knows that safe tools are provided for his use, he cannot be expected to use those which have become so defective that the defects could not be overlooked."

In the case of *Paulmier* v. *Railroad Co.*, 34 N. J. Law, 151, an engine broke through a trestle, killing a fireman. It was claimed the engineer knew of the insecurity of the trestlework, and had been directed not to go upon it. It was claimed in that case, as it is claimed here, that, because the negligence of the fellow-servant contributed to the injury, there could be no recovery; but it was held the company was liable. In *Hunn* v. *Railroad Co.*, 78 Mich. 513 (44 N. W. 502, 7 L. R. A. 500), Justice Champlin had occasion to refer to this case, and used the following language:

"The defendant requested a charge to the effect that, although the jury might find the defendant guilty of negligence, yet, if the fellow-servant of deceased contributed to produce his death, the plaintiff could not recover. This request was rightly refused. The correct rule, and the reason for it, are stated in *Paulmier* v. *Railroad Co.*, 34 N. J. Law, 155, as follows:

"'The servant does not agree to take the chance of any negligence on the part of his employer, and no case has gone so far as to hold that, where such negligence contributes to the injury, the servant may not recover. It would be both unjust and impolitic to suffer the master to evade the penalty for his misconduct in neglecting to provide properly for the security of his servant. Contributory negligence, to defeat a right of action, must be that of the party injured.'

"*Grand Trunk R. Co.* v. *Cummings*, 106 U. S. 700 (1 Sup. Ct. 493); *Keegan* v. *Railroad Corp.*, 8 N. Y. 175 (59 Am. Dec. 476); *Chicago, etc., R. Co.* v. *Swett*, 45 Ill. 197 (92 Am. Dec. 206); 2 Thomp. Neg. 981; *Perry* v. *Lansing*, 17 Hun, 34; *Busch* v. *Railroad Co.*, 29 Hun, 112; *Gray* v. *Railway Co.*, 24 Fed. 168."

See, also, *Selleck* v. *Railway Co.*, 93 Mich. 380 (53 N. W. 556, 18 L. R. A. 154), and cases there cited.

Exception is taken to the manner in which the trial judge gave defendant's requests to charge. Counsel state their contention as follows:

"It will be observed that the circuit judge failed to say that he gave the requests so read by him, or that the propositions of law therein were correct. During the argument of the law questions, the jury was excused from attendance upon the court, and it had no means of knowing that the particular requests were only part of those made, and therefore considered by the court to be correct. The court simply stated that counsel had handed them up as stating the law. Upon information, we will say that parties who heard the charge did not understand that the requests read were given. We wish to say that we understood them to be given, and were somewhat chagrined when informed that the jury did not; but, upon reading the charge, we see the force of the claim, and it is apparent that the jury was not given to understand that the requests as handed up embodied the law upon the subjects mentioned therein, and should control them in arriving at their verdict. This is made more apparent when attention is given to the court's action in relation to the oral requests, for in that case he stated the oral requests, and then proceeded to state his view. We were entitled to have these requests given, and, had we been impressed with the true situation at the time the charge was delivered, we should have called the court's attention to it; but the error cannot now be remedied except upon a new trial."

If the record were in a condition to raise the question, we do not think the point is well taken. A reading of the charge in connection with what occurred satisfies us the jury must have understood the requests were given.

Complaint is also made of that part of the charge referring to the oral request to charge the jury that they have no right to consider the failure of the defendant to procure the attendance of Mr. Gereoux as a witness. It is said the court told the jury that it might find the defendant had some reason for not procuring Gereoux as a wit-

ness, and, if so, then that should be considered. We do not so understand the charge. The request to charge was not in writing, but was oral, and evidently the court did not have much time to consider it. While the language used by the court at first is somewhat involved, it calls the attention of the jury to the statement of counsel as to why Mr. Gereoux was not present, and concludes by saying to the jury:

"You shall not infer anything against the defense in this case by reason of their omission to call him as a witness. He is not a party to the case, and the plaintiff had the same right to call him as the defendant."

We do not think the jury could have failed to understand this plain language.

Other questions are discussed by counsel. We have examined them carefully, but do not deem it necessary to refer to them further in this opinion. Many questions of fact were in dispute. We think they were properly submitted to the jury.

Judgment is affirmed.

The other Justices concurred.