BLICK *v.* OLDS MOTOR WORKS.

1. MASTER AND SERVANT—AUTOMOBILES—TESTING TRACKS—SAFE PLACE—NEGLIGENCE.

It cannot be said as a matter of law that it is the duty of an automobile manufacturer to construct a track used for testing purposes at such angles at various points in the curves as to neutralize the centrifugal force of the cars driven or tested upon the track while going at their maximum speed; but the track is sufficiently banked if it is so constructed as to be reasonably safe when the automobile is driven at extreme speed on the straight portions and at a less or at moderate rate of speed at curves: the duty of the master is to furnish a reasonably safe track upon which to perform the work.

2. SAME—SAFE PLACE.

An employer is not required by the law to furnish an

absolutely safe place; the term is relative and does not mean a place absolutely free from danger, but reasonably safe.

3. SAME—EXPERT AND OPINION EVIDENCE.

Without testimony of experts in the construction of testing tracks that defendant's track was unsafely constructed or defective or that it was desirable to traverse every portion of the track in making tests at maximum speed, a verdict in favor of defendant for the death of defendant's servant who was engaged in testing a car and running it from 40 to 50 miles an hour was justified on the ground of want of evidence of negligence.

Error to Wayne; Mandell, J. Submitted April 23, 1913. (Docket No. 10.) Decided May 28, 1913.

Case by Ida S. Blick as administratrix of the estate of Charles Fishback, deceased, against the Olds Motor Works for personal injuries. Judgment for defendant. Plaintiff brings error. Affirmed.

*Henry B. Graves,* for appellant.

*Rollin H. Person,* for appellee.

BROOKE, J. Plaintiff's intestate, Charles Fishback, a man 35 years of age, was foreman of the erecting department of the defendant company, which at the time of the injury complained of was extensively engaged in the manufacture of automobiles. Defendant maintained, adjoining its factory at Lansing, a testing track, one-half mile in circumference. Originally the surface of this track was of ordinary dirt, but about three months before the injury to plaintiff's intestate it was planked to the width of 16 feet around the outside of the track. At the curves the outer ends of the planks were raised for the purpose of overcoming the centrifugal force, by which a machine would be affected while being propelled around the track. On September 4, 1908, Fishback, with one Hunt, a tester,

175 MICH.—41.

took a car upon the track to test it. After they had gone around the track three times with Hunt driving, plaintiff's decedent took the wheel, and when making the second circuit at a high rate of speed (40 miles per hour or more) the car skidded at one of the curves; the right-hand rear wheel running over the outside edge of the planked way. Fishback thereupon cramped the car to the left in order to pull the hind wheel up on the plank again. This he accomplished, but, instead of keeping the machine on the planked portion of the way, it ran diagonally across the plank towards the center. As soon as the left front wheel struck the dirt portion of the track, he cramped the machine to the right, the wheel collapsed, Fishback was thrown from the machine upon the plank track, the machine turned over, falling upon Fishback, causing such injuries as resulted in his death in a few hours.

The declaration contains two sets of counts, one set based upon the survival act, so called, and the other upon the death act. Those under the death act were abandoned at the trial. The first count sets out the duty of the defendant and breach thereof as follows:

"And, as plaintiff avers, it thereby became and was the duty of the defendant to furnish to said Charles Bernard Fishback a safe track or roadway whereon he could inspect or cause to be inspected each automobile in manner aforesaid; and, as plaintiff avers, it became and was the duty of the defendant, in case it furnished a circular or oval track or a track with curves in it, to have the track so pitched inward at the curves as to overcome the centrifugal force of the automobile when traveling at the maximum speed necessary for the proper inspection thereof as aforesaid, and with each increase of curvature to have a corresponding increase of pitch sufficient to overcome the consequent increase in centrifugal force. Yet, as plaintiff avers, defendant did not perform its duty as aforesaid; but, on the contrary, furnished to said Charles Bernard Fishback, at its place of business in

the city of Lansing aforesaid, a planked track with curves in it of varying degrees, pitched inward at the curves, and, as plaintiff avers, there was one certain place thereon where there was a curve and where there was no pitch inward sufficient to overcome the centrifugal force of an automobile traveling at a rate of speed necessary for the proper inspection thereof, as aforesaid, and, as plaintiff avers, at the certain place aforesaid in said track, there was a sharp increase of curvature and no increase in pitch to overcome the consequent increase in centrifugal force of an automobile traveling at a rate of speed necessary for the proper inspection thereof as aforesaid; and, as plaintiff avers, the defect in said track so furnished by defendant to said Charles Bernard Fishback was not visible or apparent without measurement and was unknown to said Charles Bernard Fishback, and owing to the high rates of speed necessary to properly inspect automobiles, said track was at the place aforesaid dangerous and was not a safe place whereon said Charles Bernard Fishback could perform his duty aforesaid."

Other counts in the declaration alleged a breach of duty on the part of defendant to furnish a properly planned and constructed left front wheel, which breach of duty, it was alleged, was a concurring cause, with the defective track, of the accident. At the close of plaintiff's case the court directed a verdict for defendant under the first count, but permitted the case to go to the jury under the counts which charged negligence with reference to the wheel.

Special questions were put to the jury and were answered as follows:

"(2) Was Fishback on the track in violation of the orders? 'Yes.'

"(3) Did Fishback run off the top of the track because of his failure to drive properly or carefully? 'Yes.'"

A general verdict of no cause of action was also returned by the jury.

Counsel for plaintiff says:

"Inasmuch as we think that no error was committed in the course of the trial or in the charge of the court, so far as relates to this particular alleged breach of duty (the defective wheel), we have abandoned all the counts of the declaration except the first."

It is conceded by counsel for appellant with reference to the third question and answer that:

"The affirmative answer to this question is conclusive and the judgment is right, unless the court committed some error in receiving or excluding evidence bearing on the question, or in charging the jury on the subject, or in ruling that the question was a proper one to be submitted."

Many errors are assigned upon the admission and exclusion of testimony and the charge of the court as bearing upon these questions and answers and the general verdict. We find it unnecessary to consider these assignments because they are of no importance if the action of the learned circuit judge in directing a verdict for defendant under the first count was correct.

It will be noted that the duty alleged is an absolute one. It is:

"To have the track so pitched inward at the curves as to overcome the centrifugal force of the automobile when traveling at the maximum speed necessary for the proper inspection thereof as aforesaid, and with each increase of curvature to have a corresponding increase of pitch sufficient to overcome the consequent increase in centrifugal force."

Plaintiff introduced the evidence of two civil engineers familiar with railroad construction, neither of whom had ever designed or constructed an automobile testing track. They gave evidence tending to show that the pitch at some points in the track in question was insufficient to wholly neutralize the centrifugal force when the machine was moving at maximum speed. A theoretically perfect track, such as one witness described, built for an assumed maximum

speed of 30 miles per hour, would have had a greater pitch at some points and less pitch at others than the track in question actually had at the time it was examined by the witness.  This examination was made in August, 1910, and the track was built in the summer of 1908.  The record shows that some settlement of the banked earth might have taken place in the interim.  This expert witness testified, in part, as follows:

"By the red lines I have indicated the proper pitch required on this track at a given velocity for any kind of an automobile car.  I am figuring the perfect pitch for a certain velocity of an automobile regardless of the tires.  The tires do not enter into my computation. The weight of the car is eliminated.  That does not enter into the computation.  The distance between wheels does not enter into the computation.  The distance between the front and the rear or the two rear and the two front wheels does not enter into the computation.  The fact whether it is boards, sand, asphalt, macadam, or anything else does not enter into the computation.  The size of the tires or the make or the kind of rubber does not enter into the computation.

"*Q.* So you think you can figure a perfect track for an automobile to go around at a certain velocity and stay on without taking into consideration at all the elements of friction?

"*A.* Yes, sir.

"*Q.* That is the way this figuring is done?

"*A.* I will modify that statement by saying that I figure friction altogether, because as we figure the angle the friction is expressed in the angle.

"*Q.* What do you call that?

"*A.* Regular angular friction.

"*Q.* Where do you get that?  Is that arbitrary or an engineering rule?

"*A.* An engineering rule.

"*Q.* Do you know where that engineering rule is figured from?

"*A.* Yes, sir; I derive this formula here that I work—

"*Q.* Where did you get the formula from?

"*A.* I formulated this formula myself.

"*Q.* You made the formula?

"*A.* It is practically the same thing you get in any of the books. * * *

"*Q.* This track is perfect in design, designed for a vehicle, as you say, an automobile going around at 30 miles an hour?

"*A.* The red lines indicate what the inclination should be at 30 miles an hour.

"*Q.* That would not apply to 31 or 29?

"*A.* No, sir; it is arranged for 30.

"*Q.* It would have no application to 40?

"*A.* No, sir.

"*Q.* And so a driver that you heard testify went around at 50 miles an hour; it would have no application for him?

"*A.* No, sir.

"*Q.* How did he stay on at 50 miles an hour on the track built for 30?

"*A.* He must have cramped his wheel more than otherwise. * * * In the formula that we use for all kinds of incline tracks, the weight of the car or moving object, the motor or the train, or whatever runs on the track, comes in the equation at first; but in the mathematical equation the same terms go on both sides. To make it clear, in such track as this, as I designed on this 30 miles an hour inclination, let us call it a four-foot or whatever it may be at some point, with the same certain degree of curvature; when it is a perfect track, or perfectly designed, that means that car moving at 30 miles an hour on a curve, with a certain degree of curvature, moving at that rate will normally stand right still, not having any tendency to move out toward the outer edge or move down toward the lower edge.

"*Q.* But in taking the curve you will have to move your steering apparatus to go around the curve?

"*A.* Yes, sir; on every curve you have to move that.

"*Q.* Go ahead.

"*A.* You have to turn the steering gear to go around any curve; you cannot keep your steering gear straight ahead and try to get around a curve without disastrous results.

"*Q.* Go ahead further.

"*A.* If that car goes at a greater rate of speed than that track is designed for, then the car will tend to

tread up toward the higher part of the track, then the weight will enter in, and the weight of the car will affect it, and if there are spokes on the wheels as mentioned, or cleats on the wheels, it will help to keep that from skidding; if the car runs at a less speed than the velocity designed on that inclination, the car will tend to drop down to the lower side of the track, so in the construction of an inclined track the practice is to design the track for the high rate of speed, and that would give it greater inclination, and at all lesser rates of speed there would be a tendency to drop down, but that is less hazardous and less dangerous to drop down toward the level portion. The outer elevation is arranged for the higher rate of speed in all properly designed tracks.

"*Q.* Explain in detail what is the effect of having a change in curve there, and then no change in pitch. (Objected to.)

"*The Court:* Answer it.

"*Q.* Explain in your own language.

"*A.* To take some track that is designed with a certain degree of curvature, let us use the same velocity of the car, supposed to go 30 miles an hour, but as we advance we strike a change in the curvature and a sharper degree of curvature, where the curvature is sharper than where we are; passing from a lighter curvature to a greater curvature, and if the track is not raised higher at the outer point the incline steeper where you go to the sharper curvature, the tendency is to shoot right off the track, and if you are going at the same rate of speed, 30 miles an hour, to a lower or slighter, from a steeper or a high curve, and it is not arranged for that, as you approach the lower curvature on the same speed, or on the same rate of speed that is not designed for that, the car has a tendency to go down toward the bottom; that is as clear as I can explain it. (Witness continues:) If a track is pitched four feet and 16, that is 25 degrees straight down, and you go down that track 100 feet from the outside edge to the inside, you are traveling on a 4 per cent. grade. That is not considered a very steep grade at all."

Plaintiff's first witness, a tester of experience, testified that in testing a car:

"It was necessary to drive it at different speeds, slow and high; a car might work all right at slow speed and not work all right at high speed, or vice versa. * * * We drive from the lowest speed; from 10 to 50 miles an hour."

We do not think it can be said as a matter of law that it was defendant's duty to so construct every portion of its track as to neutralize all centrifugal force at the maximum rate of speed. It may have been—we believe it was intended—that the extreme speed necessary at times to be used should be used upon the straight or nearly straight portions of the track, and that the curves should be negotiated at a lesser and safer speed. It is obvious that a curve pitched for a speed of 50 miles per hour could with difficulty be traveled by a heavy car at the rate of ten miles per hour. The necessities of the case being considered, it is therefore apparent that a compromise in some degree must be made. It is in evidence that the car in question going at 40 miles per hour could be stopped with the brakes in approximately 100 feet, so that from a very high rate of speed it was easy to slow down at the curves to a speed at which they could be negotiated in safety. Having in mind the object to be attained by the construction of the track, viz., the testing of cars thereon at varied rates of speed, we are of opinion that the alleged defect pointed out by the expert was not such an one (if in fact a defect at all) as would have warranted the court in submitting to the jury the question of defendant's negligence in the method of construction. No practical automobile manufacturer gave evidence to the effect that the track, as constructed, was not reasonably safe for the purpose for which it was designed; nor does the evidence of the experts, in our opinion, tend to support that conclusion. It is not shown by the record that it was practicable or possible or even desirable to traverse every portion of the track at a uniform rate

of speed; indeed, the contrary appears, at least by inference.

The duty which defendant owed in the premises to plaintiff's intestate was to furnish him a place or instrumentality reasonably safe, in which or with which to perform the services required of him. *Noble* v. *Steamship Co.*, 127 Mich. 103 (86 N. W. 520, 54 L. R. A. 456, 89 Am. St. Rep. 461); *Geller* v. *Manufacturing Co.*, 136 Mich. 330 (99 N. W. 281); 7 Words & Phrases, p. 6283, lays down the rule as follows:

"The phrase 'safe place to work,' within the rule requiring a master to furnish a servant a safe place to work, is necessarily relative, and does not mean a place absolutely free from danger, but means a place that is reasonably safe"—citing cases.

See, also, 26 Cyc. p. 1097, and cases cited.

There is no testimony in this record which in our opinion tends to establish a breach of this legal obligation. The testimony of plaintiff's witnesses is to the effect that they used the track daily for many weeks prior to the date of the accident. One witness produced by plaintiff says:

"I should imagine I went around the track every day 100 to 150 times. I cannot say for how long a time. I remember they ordered us on the track from the time the track was built. Of course, it was in summer time, and they were slack, and we did not have the full number of cars to test out then, and we were out on the track most of the time. I went around the track a great many thousand times. I don't know what speed. I didn't have anything to indicate the rate of speed. We were going perhaps at different speeds. The speeds vary. On a wet day you cannot go as fast as on a dry day. I have driven, I think, as fast as 45 miles an hour. I can't say that I did that often. Thirty miles an hour was our average speed. We took that speed because that was the speed that we were ordered to take as near as we could. There was an order put up—I cannot say when—about the speed of the cars on the track. I think that required

30 miles an hour. I don't remember when that notice was put up. I never ran off the track. I steered so I kept on."

Another witness for plaintiff testified:

"I could not say how many times I have been around the track, but it was a good many times. Sometimes I drove rapidly. It is hard to tell how fast, sometimes 45 miles an hour. I don't know whether I used to go 50 miles an hour; I was too busy engaged with the steering wheel. I dare say I have been around that track 50 miles an hour. I have seen other men going around at 50 miles an hour."

Still another of plaintiff's witnesses testified:

"I couldn't remember the exact time the track was put in there—around about June. I know that the track was there something like three months when the accident happened. That is my judgment. I had been on it about every working day. I had been around it some six or seven times a day in different cars, four or five. I think we would average five different cars a day on it. I tested all that we turned out. It would run up from 300 to 500, I should judge. I had always kept on the track. I had never gone off. We would always skid on the turns if going at a high speed.

"*Q.* If you always skidded, could Mr. Fishback have gone around without knowing that you skidded?

"*A.* Yes; might skid a little but not any to speak of.

"*Q.* It was just a little skidding?

"*A.* Just a little bit, enough there so you noticed the wear on the tires.

"*Q.* What do you mean by a little skidding?

"*A.* A certain amount of side motion to that car.

"*Q.* A foot or two feet; what do you mean?

"*A.* I have skidded two feet.

"*Q.* You have skidded two feet?

"*A.* Yes, sir; but not very often on that particular track.

"*Q.* That is, at very high speed?

"*A.* Yes, sir.

"*Q.* What would be the average speed that you would skid?

"*A.* It would depend on the speed; if you were going around 50 miles an hour, there were times that you skidded probably a foot or two feet; skidded, I think there were times that I skidded the rear end of the car two feet.

"*Q.* You say that is not the average—what was the average at 50 miles per hour?

"*A.* I don't know what the average was, I don't suppose it would average a foot. * * * If I was going down the side of the track 50 miles an hour, I would slow up before I hit that turn. Slow up to 40 miles an hour. It is not perfectly straight before we reach the turn. There is a slight curve, but not anything like that. If I was going 40 miles an hour, I would not slow up as a rule. I did not consider it sufficiently dangerous to require slacking at 40. I can't say that Mr. Fishback slackened up before he got there. We were not coming at anything faster than 40 at that place on the track, I don't think."

All the witnesses agree that the testing of automobiles is a hazardous occupation; that to drive a machine on a straight level road at 50 miles per hour is dangerous, and we might well take judicial notice of this fact without testimony.

Assuming that both special questions were improperly propounded or improperly answered, and that plaintiff's intestate not only had a right to be upon the track at the time he received his injury, but that in driving the car as he did he exercised reasonable prudence, there is still lacking evidence of actionable negligence upon the part of defendant.

Decedent is shown to have been an expert in the line of his duty, having held the high position of foreman for several years prior to his death. He had, himself, driven cars many times around this track. The tendency of an object to fly off at a tangent when being propelled rapidly around a curve (centrifugal force) is a matter of common knowledge possessed by all intelligent adults. With the operation of this well-known law upon automobiles decedent was, through

experience, peculiarly familiar, so it might well be said —though it is unnecessary in this case—that he assumed the risk of injury from driving upon the curve at so high a rate of speed.

The judgment is affirmed.

Steere, C. J., and Moore, McAlvay, Kuhn, Stone, Ostrander, and Bird, JJ., concurred.