VAN AUKEN v. MICHIGAN CENTRAL RAILROAD CO.

1. CARRIERS—PASSENGERS—RAILROADS—LICENSEE.
Where an employee of a lumber company rode to and from his work on a logging train of the defendant railroad company, without charge for transportation, and it appeared that the defendant carried few passengers over this por-·tion of its road, which was a logging branch, and that those who did ride were required to sign a release of liability, with a provision that the passenger assumed all risks, also that the defendant had filed and published its schedules of rates pursuant to Act No. 300, Pub. Acts 1909 (3 How. Stat. [2d Ed.] § 6524 et seq.), and in accordance with the provisions of section 5 of the statute was prohibited from carrying passengers free, excepting certain classes of persons (which did not include decedent), he was a mere licensee, and whether he innocently or wilfully violated the law, he was entitled to no greater rights than one who procured the pass by consenting to assume all risks of transportation.[1]

2. MASTER AND SERVANT—FELLOW-SERVANTS—DEATH.
A member of a loading crew who was killed because a carload of timber was insufficiently or improperly wired by other members of the gang, was not entitled to recover for the neglect of his coemployees, in the absence of testimony to prove that the car was not properly inspected, or that due inspection would have disclosed a defect in the wiring or loading.

3. RAILROADS—LOGGING ROAD.
A railroad corporation has the right to impose such restrictions upon liability to passengers riding on a branch line on its logging trains as it may see fit; general rules in use for the operation and maintenance of trains on the main line being impracticable.

[1] On the question of the degree of care owed to free passenger in absence of stipulation upon the subject, see notes in 5 L. R. A. (N. S.) 721 and 46 L. R. A. (N. S.) 142.

[1] For the liability of the proprietor of a logging railroad for injuries sustained by person other than employee, while being carried thereon, see notes in 12 L. R. A. (N. S.) 131 and 22 L. R. A. (N. S.) 190.

4. SAME—AGENCY.

> A conductor has no authority to bind his employer by permitting or inviting the servant of another corporation to ride upon its train free of charge in contravention of the established rates and schedules.[1]

KUHN, OSTRANDER, and BIRD, JJ., dissenting.

Error to Otsego; Sharpe, J. Submitted November 21, 1913. (Docket No. 69.) Decided October 2, 1914. Rehearing denied January 29, 1915.

Case by Abram A. Van Auken, administrator of the estate of Anson Maurer, deceased, against the Michigan Central Railroad Company for the unlawful killing of decedent. Judgment for plaintiff. Defendant brings error. Reversed.

*Watts S. Humphrey* and *George L. Alexander* (*Humphrey, Grant & Humphrey,* of counsel), for appellant.

*Hall, De Foe & Hall,* for appellee.

In July, 1910, defendant maintained in connection with its Mackinaw Division what is called in the record its "Haakwood Branch." This was a logging branch about 22 miles long, connecting with the main line at Wolverine. The Wylie-Buell Lumber Company were conducting a lumbering operation upon this branch. At this time (July, 1910) they were getting out sawlogs and timber for use in piling, the latter 30 feet long and 8 or 10 inches in diameter at the top and 14 to 16 inches in diameter at the butt. To facilitate the loading of these logs, the lumber company used a steam loader. This loader was mounted upon a flat car which, together with a boarding car used by the loading crew, was moved from place to place by defendant as occasion required.

---

[1] As to the liability of a railroad company for injury to person wrongfully on freight train by collusion with a train employee, see notes in 5 L. R. A. (N. S.) 1025 and 37 L. R. A. (N. S.) 421.

It seems to have been customary for the loading crew or some part of it to go in to Wolverine each Saturday night and there spend Sunday. Sometimes the boarding car would be run back and forth, at others the loaders would ride in the ordinary caboose attached to the train. No fare was demanded or collected from the loaders in either event. On Saturday, July 29th, a train of 10 cars had been loaded with logs— the last 3 cars being loaded with the 30-foot piling above described. This piling was loaded upon flat cars, upon the sides of which were placed stakes reaching about one foot above the level of the car floor. The logs were piled in the form of a pyramid, and were secured by No. 9 wires, passed through the pockets at the side and over the logs near each end. The wires were tightened by twisting them with an inch bar, at a point near the top of the load. Behind the cars thus loaded was placed the caboose.

Maurer, plaintiff's decedent, was a member of the loading gang employed by the lumber company. He was the operator of the steam loader. On the night in question, as the train was about to start to Wolverine, he boarded the caboose and took a position in the cupola of that car. After the train had gone about 10 miles, and when it was running at about 10 or 12 miles per hour, the forward end of one of the logs upon the car immediately in front of the caboose settled down between the two upon which it rested. This resulted in crowding the log nearest the side of the car outward and into a position where it, for a short time, hung in the wire. The wire soon broke, and the front end of the log dropped to the ground; the rear end still being held in place by the wire upon that end. As soon as the end of the log struck the ground, it caught and, as the train moved forward, the other end was driven through the end of the caboose instantly killing Maurer.

The loading was done by an experienced crew of

loaders, employed by the lumber company. They testified that it was done in the ordinary manner, and as safely as possible, according to their experience. After the loading was completed the cars were inspected by the conductor of the train, who determined that they were properly and safely loaded, and accepted them and caused them to be placed in the train. The train crew, including the conductor, were men of large experience in the handling of forest products. The car in question was loaded in pyramid form, and wired in accordance with the rules and practice of the defendant company, which has handled about 100,000,000 feet of timber per annum during the past 15 years.

It appears that the Haakwood logging branch was built in 1905 under a contract with the Wylie-Buell Lumber Company which in part provided:

"That it [the lumber company] will load and unload all cars; will not load the same beyond their marked capacity; and will comply with the rules of said railroad company as to the manner in which cars shall be loaded and the loads secured thereon.

* * * * * *

"It is agreed that if any of the covenants on the part of the railroad company herein contained shall, at any time, be adjudged by the interstate commerce commission, or by the commissioner of railroads of the State of Michigan, or by any court of competent jurisdiction, to be in violation of the law, said railroad company shall not be required to perform said covenant or covenants, but this agreement shall nevertheless in all other respects continue in force according to its terms."

The agreement contains no covenant on the part of defendant to transport free of charge, the steam loader, the boarding car, or the men engaged in loading, yet there seems to have grown up a practice to do all these things. The loaders were carried free while all other woodsmen in the employ of the lum-

ber company were charged fares when going to and from their work. Very few passengers were carried, and when any presented themselves for carriage they were required, under the rules of the company, upon payment of fare, to sign the following release:

"Good only when officially executed by conductor as indicated by punch marks in amount column. This permit is accepted by the holder with a full understanding that this company is not a common carrier of passengers by its freight trains; that such trains are not safe as passenger trains, and do not stop at station platforms, and the holder of this permit assumes all risk of injury from accidents while riding on or getting to and from the train. If used as half fare the parent or guardian must sign the release. Only hand baggage will be carried. No baggage will be checked on this permit.

"I agree to the above contract.
"· · · · · · · · · · · · · · · · · · · · ·
"[Signature of Purchaser.]"

The schedule of rates governing the Haakwood Branch, published and filed according to law, was as follows:

"One way train fares for use of conductors in collecting cash fares on logging branches of Mackinaw Division between stations where no tickets are used. Passengers will be carried on freight trains between stations on logging branches Mackinaw Division, Michigan Central Railroad, at the fares named below, and subject to the following conditions. Conductors will issue to each passenger a cash fare permit, form L. T. D., requiring each passenger to sign the release on the back thereof, facsimile of which is shown below. Cash fare permit will not be valid for passage unless signed by the passenger."

Act No. 300 of the Public Acts of 1909 (3 How. Stat. [2d Ed.] § 6524), is regulatory of common carriers. Section 5 thereof prohibits railroads from carrying passengers free, except employees and certain other enumerated persons, of whom plaintiff's decedent was not one. The same section makes a vio-

lation of this provision a misdemeanor, punishable by
a fine of from $100 to $500. The passenger accepting
free transportation is subjected to the same penalty
as the carrier who furnishes it.

Section 10, subd. (a) compels the publication and
filing of schedules. It is undisputed that this portion
of the act was complied with by defendant, and that
no other rates or concessions were in effect, except as
shown by the schedules on file, at the time Maurer
received his injury.

The fourth count of plaintiff's declaration sets out
the various duties of defendant and the several
breaches thereof. It is further charged:

"That upon, to wit, the day aforesaid, plaintiff's
intestate was employed by, to wit, one Frank Buell as
engineer of a certain steam log loader then in use
at and about certain logging, banking, and loading
grounds upon said Haakwood Branch of defendant's
said railroad at and near what is commonly known
and referred to as Doane's switch, in the township
of Waverly, Cheboygan county, and that under and
in pursuance of a certain practice, understanding,
and agreement between said defendant and intes-
tate's said employer, said defendant undertook, con-
sented, and agreed to carry and transport plaintiff's
intestate and others similarly employed upon and
about said log loader from the point where so em-
ployed over and along said Haakwood Branch and
to the main line of said railroad and elsewhere upon
its freight and logging trains operated upon such
branch, and for a long time prior thereto had made
it a practice to carry and transport such persons upon
said trains and within the way car thereof and other-
wise.

"That upon, to wit, the date aforesaid, the plain-
tiff's intestate boarded a certain log and freight train
at, to wit, said Doane's switch, and entered the way
car thereof for transportation thereon in accordance
with the usual practice in that regard, and at the in-
vitation and with the knowledge and consent of said
defendant, and said defendant, in pursuance of said
practice and under such certain understanding and

agreement, undertook and consented to carry and transport said plaintiff's intestate upon said train and in the way car thereof from, to wit, said Doane's switch to, to wit, Wolverine, to wit, Vanderbilt, upon the main line of said railroad.

"And plaintiff alleges that, defendant having so undertaken and agreed to carry and transport plaintiff's intestate as aforesaid under the said practice, understanding, and agreement, it then and there became and was the several duty of defendant."

The court, after refusing to direct a verdict in favor of defendant, submitted the case to the jury under the fourth count.

Upon the question of defendant's negligence the court charged:

"Under the evidence in this case the only duty which defendant owed to plaintiff's decedent was to properly inspect the loaded car from which the log which killed decedent fell. This duty does not make defendant an insurer that the log would not fall from the car. And if you believe from the evidence in this case that the employees of the defendant were competent men for that duty and made a reasonably careful inspection of said car, your verdict must be for the defendant—and determined that the car was safe, I would add to that."

And further:

"There is, however, a preliminary question which I think you should first settle or first consider before you go into this question of negligence. That is as to whether or not the plaintiff is entitled to recover at all. It is the claim of defendant that Mr. Maurer was a trespasser on this train. In other words, that he had not any right to be there or to ride there without paying his fare. Attention has been called, and I think the statute has been read in your presence— if not I state it to you—that it is the law of this State that no one has any right to ride upon a passenger train or any train carrying passengers, in any way, without paying fare. The law makes it a criminal offense for any one to so ride and it makes it a crim-

inal offense for the conductor to permit any one to ride upon the train without paying his fare. Now the claim of the defendant is that this was the way in which this man rode, and I say to you as a matter of law that if he was so riding and knew he was so riding in violation of this law, he cannot recover in this case. But it is the claim of the plaintiff that he was not so riding. That while he did not personally pay his fare, that he had reason to believe, and they claim that he did believe, that he had a right to be carried under some arrangement or agreement made by his employer, Mr. Buell, and the railroad company, whereby these loaders were to be carried. Now, if you find that to be true, if you find that this man believed—and you must take the evidence of the conductor as to what he believed, and also the evidence of the other loaders who have been sworn—if you find that this man who was killed, Mr. Maurer, believed that he had a right to ride on this train, and that he was not violating any law in doing it; that his carriage was in some way arranged for by his employer—then I say to you that he was lawfully on the train, and if he was lawfully there the defendant owed him a duty. Now, if you find that he was lawfully on the train, we next come to the question as to what duty the defendant company owed him and the claimed act of negligence on which the plaintiff relies."

Plaintiff having recovered a judgment for $5,500, defendant reviews the case in this court by writ of error.

BROOKE, J. (*after stating the facts*). The evidence introduced on behalf of plaintiff conclusively shows that the load in question was loaded by experienced men in accordance with the rules of the defendant company and a practice which had prevailed for many years. We think it also sufficiently appears that the method followed had proven reasonably safe and efficient. There is no testimony in the record tending to show that the conductor, or any member of the crew of the train, was either inexperienced or in-

competent.   The inspection made by the conductor was the usual one, and he testified that he believed the car to be safely loaded; otherwise he would have refused to receive it in his train.   Nor is there any evidence that a proper inspection would have disclosed a defect in the wiring.   The loading and wiring were done by fellow-servants of Maurer and every log in the load was placed in position by himself, operating the steam loader, under the direction of the top loader.   If the car was improperly loaded or wired, it would seem that the negligence involved would be that of a fellow-servant.   *Powers* v. *Lumber Co.*, 92 Mich. 533 (52 N. W. 937).

But be this as it may, there is, in our opinion, another and an insurmountable obstacle to plaintiff's recovery.   The statute (Act No. 300, Pub. Acts 1909) absolutely prohibits defendant from furnishing, and all persons from accepting, transportation except in compliance with the provisions of the law.   Had plaintiff's decedent complied with the lawful requirements for transportation over this logging branch, the terms of his contract would have prevented recovery.   Can it be said that because he (either innocently or wilfully) violated the law, he is thereby placed in a better position than he would have occupied had he complied therewith?   We think not.   Maurer was not a "passenger" in the ordinary acceptation of that term, upon a passenger train.   He was at most a bare licensee, to whom defendant owed no duty except to refrain from injuring him wantonly or wilfully.   3 Elliott on Railroads, § 1255, and cases cited.

The cases cited and relied upon by plaintiff have been examined.   They are cases based on the carriage of passengers upon passenger trains, and are therefore not applicable to the case at bar, where the train was not a passenger train, and where the conductor

thereof was held out to the public as one having a definite and limited authority as to the terms upon which passengers should be carried. Defendant had the right to impose such restrictions touching its liability as it saw fit with reference to the carriage of passengers upon its logging trains. *Arnold* v. *Railroad Co.*, 83 Ill. 273 (25 Am. Rep. 386). We have recently held that the general rules in use for the operation and maintenance of trains on the main line are impracticable and inapplicable to logging roads. *Ingersoll* v. *Railway Co.*, 168 Mich. 380 (134 N. W. 441).

The learned circuit judge predicated plaintiff's right to recover upon Maurer's belief "that he had a right to ride on this train, and that he was not violating any law in doing it." That is to say, that the consequences of an illegal act may not be visited upon one who ignorantly violates the law. Aside from the fact that the record is barren of evidence as to what Maurer believed when he took passage upon the train, it is clear that his ignorance of the law, if it existed, cannot affect his legal rights. 1 Elliott on Evidence, § 96. 1 Jones on Evidence (1st Ed.), § 20.

The conductor had no authority to bind defendant by inviting or permitting Maurer to ride upon a logging train in contravention of its published schedule and the statute. See *Moore* v. *Railroad Co.*, 115 Mich. 103 (72 N. W. 1112).

We conclude that a verdict should have been directed in favor of defendant.

The judgment is reversed, and there will be no new trial.

MCALVAY, C. J., and STONE, MOORE, and STEERE, JJ., concurred with BROOKE, J.

BIRD, J. (*dissenting*). Being unable to agree with Mr. Justice BROOKE in the conclusions he has reached in this case, I herewith submit my own views.

The declaration counts upon the fact that the car was improperly loaded and also upon the want of a proper inspection. Experienced loaders gave evidence on the trial that the car was improperly loaded. The testimony on both of these questions was ample in my judgment to carry them to the jury. But it is said that the deceased was a fellow-servant of the loaders, and therefore plaintiff cannot recover. Notwithstanding this fact, if the defendant was negligent in its inspection of the car before placing it in the train, the fact that the deceased was a fellow-servant of the loaders would furnish no protection to defendant against its own negligence. *McDonald* v. *Railroad Co.*, 108 Mich. 7 (65 N. W. 597); *Noble* v. *Steamship Co.*, 127 Mich. 103 (86 N. W. 520, 54 L. R. A. 456, 89 Am. St. Rep. 461); *Welch* v. *Traction Co.*, 154 Mich. 399 (117 N. W. 898).

The right to recover is finally denied plaintiff on the ground that in boarding the train to ride from his work to his home in Wolverine the deceased violated Act No. 300 of the Public Acts of 1909 (3 How. Stat. [2d Ed.] § 6524), prohibiting free transportation. From the testimony it clearly appears that the deceased understood that he had a right to ride by reason of some arrangement between his employer and defendant. The conductor recognized this right and permitted him to ride, and, from the testimony, it further appears that in 1907 some agreement was made whereby the loaders were to be carried to and from their work. If the transportation of the loaders was being taken care of by the agreement, the deceased was not violating the act prohibiting *free* transportation.

But whatever the facts are concerning the agreement, it was conclusively shown that both the deceased and the conductor understood that plaintiff's intestate was to be carried to and from his work. This being so, the deceased thereby became a passenger and was

entitled to the same protection against negligent injuries that other passengers were entitled to on the logging train. It is said his belief that he had a right to ride and his ignorance of the law cannot avail him. If the deceased, in good faith, believed he had the right to ride, as the jury found by their verdict, he could not be guilty of *wilfully* violating the law. But suppose he did know the law and was in doubt about his right to ride, but was accepted and recognized as a passenger by the conductor, how does that absolve the defendant from answering to him or his estate for negligent acts for which it would be obliged to answer to any other passenger? If it is to be held that the company is absolved because the deceased was riding in violation of law, what becomes of the case of *Van Auken* v. *Railway Co.*, 96 Mich. 307 (55 N. W. 971, 22 L. R. A. 33), wherein it is held:

"That a party traveling upon the highway upon a Sabbath, either from necessity or for pleasure or business, who is injured by a collision with a railway train at a crossing, is not barred from recovery against the [railroad] company for its negligence from the fact that the injury occurred on Sunday."

The only difference between that case and this is that in the case cited the plaintiff alone was violating the law, whereas in this case it is said both plaintiff and defendant were violating it. The rule governing such cases is very clearly laid down by Hutchinson on Carriers (2d Ed.), (section 566).

"The carrier is liable to persons whom it accepts for transportation over its line, and from whom it demands no fare, to the same extent that it is liable to passengers who pay fare. A person riding on a free pass is as much a passenger as if he were paying full fare, and if the pass is given for a valuable consideration, he is a passenger for hire. The fact that the carrier is prohibited by law from issuing free passes does not render a person a trespasser who travels upon such a pass unlawfully issued to him.

If the pass is unlawful, the conductor should demand
the regular fare, and his failure to do so will not make
the traveler a trespasser, nor destroy his rights as a
passenger." [5 Am. & Eng. Enc. Law (2d Ed.), pp.
507, 508.]

This rule has been followed by many State courts
and by the Federal Supreme Court. *Buffalo, etc., R.
Co.* v. *O'Hara*, 3 Penny. (Pa.) 190; *McNeill* v. *Rail-
road Co.*, 135 N. C. 682 (47 S. E. 765, 67 L. R. A.
227); *John* v. *Railway Co.*, 42 Mont. 18 (111 Pac.
632, 32 L. R. A. [N. S.] 85); *Bradburn* v. *Light Co.*,
45 Wash. 582 (88 Pac. 1020, 14 L. R. A. [N. S.] 526);
*Gabbert* v. *Hackett*, 135 Wis. 86 (115 N. W. 345, 14
L. R. A. [N. S.] 1070; *Schuyler* v. *Southern Pacific
Co.*, 37 Utah, 581 (109 Pac. 458); *Id.*, 37 Utah, 612
(109 Pac. 1025); *Southern Pacific Co.* v. *Schuyler*,
227 U. S. 601 (33 Sup. Ct. 277, 43 L. R. A. [N. S.]
901).

The last case cited deals with the penalty clause
of the Hepburn act (Act June 29, 1906, chap. 3591,
34 Stat. 584, § 1 [U. S. Comp. Stat. Supp. 1911, p.
1284]) which makes both the giver and receiver of
free transportation equally guilty of a violation of
the act. It is said:

"But, finally, it is argued (*b*) That it was beyond
the power of the State court to 'read into the Hep-
burn act an exception in favor of gratuitous pas-
sengers,' thereby (as is said) enlarging the class to
whom Congress limited the right of free interstate
transportation. This is ingenious, but, as we think,
unsound. As applied to the concrete case, it is equiva-
lent to saying that the operation of the Hepburn act
is such as to deprive one who, in good faith and with-
out fraud, and with the consent of the carrier, but in
actual though unintentional violation of the prohibi-
tion of the act, accepts a free passage in interstate
transportation, of the benefit of a rule of local law
that renders the carrier in such circumstances respon-
sible for exercising care for the passenger's safety
because the carrier has voluntarily undertaken the

burden of such care. But the act itself declares what penalty shall be imposed for a violation of its prohibition:

"'Any common carrier violating this provision shall be deemed guilty of a misdemeanor and for each offense, on conviction, shall pay to the United States a penalty of not less than one hundred dollars nor more than two thousand dollars, and any person, other than the persons excepted in this provision, who uses any such interstate free ticket, free pass or free transportation, shall be subject to a like penalty.'

"This penalty is not to be enlarged by construction. Neither the letter nor the spirit of the act makes an outlaw of him who violates its prohibition by either giving or accepting gratuitous interstate carriage. The deceased no more forfeited his life, limb, or safety, and no more forfeited his right to the protection accorded by the local law to a passenger in his situation, than the carrier forfeited its right of property in the mail car upon which the deceased rode. His right to safe carriage was not derived, according to the law of Utah, from the contract made between him and the carrier, and therefore was not deduced from the supposed violation of the Hepburn act. It arose from the fact that he was a human being, of whose safety the plaintiff in error had undertaken the charge. With its consent he had placed his life in its keeping, and the local law thereupon imposed a duty upon the carrier, irrespective of the contract of carriage. The Hepburn act does not deprive one who accepts gratuitous carriage, under such circumstances, of the benefit and protection of the law of the State in this regard."

In my opinion the judgment of the trial court should be affirmed.

KUHN and OSTRANDER, JJ., concurred with BIRD, J.